FIFTH DIVISION
July 30, 2010

No. 1-08-2679


| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 30054 |
| | ) | |
| KEVIN BARKER, | ) | The Honorable |
| | ) | John J. Fleming, |
| Defendant-Appellant. | ) | Judge Presiding. |


JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Following a jury trial, defendant Kevin Barker was convicted of first degree murder, home invasion, and two counts of aggravated criminal sexual assault. The trial court sentenced defendant to 60 years' incarceration for murder, a concurrent 20 years' incarceration for home invasion, and two consecutive 20-year terms for aggravated criminal sexual assault. Defendant appealed. This court reversed defendant's home invasion conviction but upheld his convictions for aggravated criminal sexual assault and murder. Defendant subsequently petitioned the trial court to conduct fingerprint or forensic testing. The trial court denied his petition, finding that the evidence had already been subjected to DNA testing. Defendant now appeals.

I. BACKGROUND

At trial, Kimberly Walton testified that she was a friend of victim Latrina Rice. She testified that the victim lived at 723 North Central in Chicago. The victim stayed overnight with Walton beginning Monday, April 9, 2001, and Walton braided the victim's hair and applied false

fingernails. They briefly returned to the victim's apartment on Thursday morning. While there, the victim went to her nextdoor neighbor, Joy McGill's, apartment to ask for a cigarette. She was "upset" with Joy when she returned. Walton and the victim then returned to Walton's house, where the victim stayed until Saturday. Walton drove the victim home at about 8 p.m. on Saturday evening and made plans to see one another the following day, Easter Sunday, April 15, 2001. The next day, Walton telephoned the victim numerous times, but the victim did not answer the phone. Walton testified that although the victim told her about her dating relationships, she never mentioned defendant.

Vivian Dockery, the victim's friend, testified that she spoke to the victim around 11 p.m. on Saturday, April 14, 2001.

Evelean Hampton testified that she lived down the hall from the victim in April 2001. She saw the victim enter her apartment alone around 7 p.m. on April 14, 2001. On April 16, the victim's mother came to her door, crying, saying the victim was dead. Hampton went to the victim's apartment, where she found the victim, lifeless, on the floor.

On cross-examination, Hampton admitted that she did not hear anything unusual coming from the victim's apartment between April 14 and April 16, 2001.

The victim's mother, Nancy Massie, testified that she tried unsuccessfully to call the victim on April 14 and 15, 2001. She expected the victim to come to her house for Easter dinner on April 15, but she did not appear. She went to the victim's apartment on Monday, April 16, opened the unlocked door, and found the victim dead on the floor.

Deputy Medical Examiner Dr. Aldo Fusaro testified that he performed an autopsy on the

victim and determined that the cause of death was homicide by multiple stab wounds. He testified that the victim was 5 feet 5 inches and weighed 213 pounds. He noted a white substance coming from the victim's vagina. He swabbed the victim's vagina and anus. He noted that no anal or vaginal tears were identified. He further noted that the victim's fingernails contained a clear polish or artificial nail adhesive, and one finger had a loosely adherent artificial fingernail. The victim had been stabbed approximately 60 times, including a series of wounds to the victim's airway, which, Dr. Fusaro testified, could have affected her ability to scream.

On cross-examination, Dr. Fusaro testified that "intact spermatozoa can be found in the vaginal area 72 hours after coitus." He also noted that the victim did not have the vaginal and anal tears associated with "rough sex."

On redirect examination, Dr. Fusaro testified that he would expect to find intact spermatozoa in a person who was murdered at the time she was sexually assaulted. Dr. Fusaro further testified that lack of vaginal and anal tears does not rule out sexual assault.

On re-cross-examination, Dr. Fusaro admitted that nonconsensual anal sex would "more likely" result in tears than nonconsensual vaginal sex. Dr. Fusaro also admitted that he did not know how long before her death the victim had intercourse.

Chicago police forensic investigator Gerald Ostafin testified that he responded to the victim's apartment on April 16, 2001, to find her, dead, on the floor. She was lying on her back wearing only a bloodied T-shirt, which was pulled up to her breasts. Investigator Ostafin observed "quite a lot of blood" where the victim was lying and blood spatter on the walls. He observed a "blood smear" on the inside front door frame by the lock. He noted that the victim

3

had "multiple puncture wounds" on her body. Investigator Ostafin testified that he collected and inventoried items from the apartment, including six false fingernails found scattered throughout the apartment and a condom wrapper.

On cross-examination, Investigator Ostafin testified that there was no sign of forced entry to the apartment. He also testified that he did not find any underwear or pants in the apartment that were "related to the scene."

Illinois State Police forensic scientist Karen Heard testified as an expert in latent print examination that she did not find any suitable fingerprints on objects she tested from the crime scene.

Chicago police detective James De La Font testified that he was assigned to investigate the victim's death. He testified that he did not find any weapons in apartment 305, the victim's apartment. On April 16, 2001, he canvassed the victim's apartment building, speaking with various individuals, including defendant. At that time, defendant was in an apartment at the end of the hallway on the same floor as the victim, with two individuals who lived there. Defendant explained to Detective De La Font that he lived in apartment 307 with his girlfriend, Joy McGill. Defendant told Detective De La Font that he, Joy, and the victim were friends, and that he had known the victim for three years. Defendant also told Detective De La Font:

"[H]e hadn't seen [the victim] around the apartment. She was in and out most of the time for two weeks prior to that day, to 16 April, and he hadn't seen her for approximately - you know, in and out for two weeks."

Further, defendant told him that Joy had moved out of the apartment on April 12. Detective De

La Font testified that he then continued canvassing the building and eventually collected DNA samples by buccal swab from Edward Knight, Lonnie Jolly, and Gregory Dockery. Detective De La Font returned to the victim's building on April 18, 2001, and again spoke with defendant. On April 25, 2001, he returned to the victim's apartment and recovered more false fingernail fragments.

Detective De La Font testified that, on June 5, 2001, he and his partner went to defendant's aunt and uncle, Shirley and James Ballard's house, where defendant then lived. Defendant agreed to go with the detectives to the police station. At the police station, defendant stated that he was friends with the victim and Joy. He said that, in April 2001, he and Joy lived next door to the victim. Defendant claimed he last saw the victim on April 11, 2001, when she came to his door to ask Joy for a cigarette. He stated that he "got upset" when she asked for the cigarette, because she did so regularly. Defendant told Detective De La Font that, on Thursday, April 12, he discovered that Joy had moved out of their apartment. He then knocked on the victim's door to ask if she knew where Joy had gone, but the victim did not answer her door. He returned to his apartment, where he stayed for the remainder of the night. After work on Friday, April 13, he went out with a friend overnight, then went to the Ballard residence at 9 a.m. on Saturday morning. He stated that he stayed the entire day at the Ballard residence and slept overnight on a couch in the Ballards' living room with Karin Barker. Karin left Sunday morning, and defendant stayed all day and night Sunday at the Ballards' house. He returned to his apartment on Monday, April 16, which is where he learned that the victim had been killed. Defendant denied killing the victim.

After Detective De La Font interviewed James and Shirley Ballard, defendant admitted that he "was not completely truthful" before. He explained that he did not sleep on the Ballards' couch Saturday night with Karin, nor in the Ballard residence on Sunday night, but instead slept alone in the garage. Defendant explained that his uncle did not allow him to sleep in the house, but his aunt sometimes secretly allowed him to sleep in the garage. The detective then spoke with the aunt again and did not pursue further questioning regarding this. Defendant agreed to have a buccal swab performed.

Detective De La Font spoke with Marcus Dawson in July 2001, who also consented to a buccal swab.

After receiving DNA analysis results from the Illinois State Police Crime Lab regarding both the semen collected from the victim and the false fingernails collected at the scene, Detective De La Font reinterviewed defendant on October 5, 2002. In that interview, defendant said he was just an acquaintance of the victim, rather than a friend, and "became adamant, got very loud, that he did not have sex or any contact at all with [the victim]." He again denied killing her.

On cross-examination, Detective De La Font admitted that he did not see any scratches or bruises on defendant when he first spoke with him on April 16, 2001.

Illinois State Police Crime Lab forensic scientist Brian Hapack testified as an expert in forensic biology that he tested biological samples from the victim's vagina, mouth, and rectum. The vaginal and rectal samples were positive for the presence of semen.

Illinois State Police Crime Lab forensic scientist Tanis Wildhaber Pfoser testified as an

expert in DNA analysis and serology. Pfoser tested the buccal swabs from five men: defendant, Knight, Jolly, Dockery, and Dawson, in connection with the victim's death. She analyzed the DNA profiles on each swab, as well as the profile obtained from the victim's blood standard. She then compared these profiles with the DNA found in the semen swabbed from the victim's vagina and determined that it was consistent with defendant's DNA to a statistical significance of 1 in 1.1 billion of the black population. Pfoser also tested and compared the DNA profile in the semen swabbed from the victim's rectum and determined that it was also consistent with the DNA of defendant to a statistical significance of 1 in 2,000 black individuals. Pfoser concluded that the DNA profiles in the vaginal and rectal semen swabs were consistent with having originated from defendant. She examined the DNA evidence using two testing kits - ProFiler and Cofiler- and then entered the vaginal swab into the Combined DNA Indexing System.

Pfoser testified that she also tested and compared the DNA profile from seven false fingernails recovered from the victim's apartment. Three of the fingernails contained insufficient amounts of DNA material to analyze. A fourth fingernail, which was collected in pieces, showed no signs of blood on it, but did contain DNA material consistent with a female profile other than the victim. A fifth fingernail had reddish-brown stains similar to blood and contained DNA consistent with the victim's DNA profile.

Two additional fingernails also exhibited reddish-brown stains consistent with blood. The stains on the first tip, which was recovered directly inside the victim's front door, were present both under and on top of the nail. Pfoser testified that her analysis revealed that the nail contained two DNA profiles, one consistent with defendant and the other with the victim.

7

Specifically, Pfoser testified that defendant could not be excluded from the male profile, which occurs at a frequency of 1 in 80 black males, 1 in 380 white males, and 1 in 320 Hispanic males. The second fingernail, which was recovered from behind the victim's sofa, also had reddish-brown stains and contained a DNA profile consistent with defendant. The occurrence rate on that profile was 1 in 9,800 black individuals, 1 in 77,000 white individuals, and 1 in 99,000 Hispanic individuals. Each of the four other swabbed men was excluded from the profiles found on these two nails.

The State rested. Defendant did not testify at trial, nor put on any witnesses. Defense rested.

The jury found defendant guilty of murder, two counts of aggravated criminal sexual assault, and home invasion. The trial court sentenced defendant to 60 years' incarceration for murder, a concurrent 20 years' incarceration for home invasion, and two consecutive 20-year terms for aggravated criminal sexual assault. Defendant appealed.

While his direct appeal was pending, defendant seems to have filed a motion pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2008)), requesting additional DNA testing on evidence used to support his conviction. However, such motion does not appear in the record. The trial court's half-sheets reflect that the motion was filed on April 20, 2006, and that six days later on April 26, 2006, the trial court denied the motion. A copy of the order denying the motion is also missing from the record. However, notations of the half-sheets state that defendant's *pro se* motion for DNA testing was denied because DNA testing was done pretrial and DNA evidence was presented at trial. Nothing in the

record indicates that defendant appealed from that ruling.

On March 31, 2008, this court affirmed defendant's convictions for aggravated criminal sexual assault and murder, but reversed his conviction for home invasion.

On August 4, 2008, defendant filed a "Petition for Fingerprint or Forensic Testing Not Available at Trial Regarding Actual Innocence," pursuant to section 116-3 of the Illinois Code of Criminal Procedure (725 ILCS 5/116-3 (West 2008)). Defendant specifically requested DNA testing on Exhibits 11A (the underside of the victim's fingernail), 4A1 (vaginal swab), and 4C1 (rectal swab). He asserted that identity was the issue at trial, that the exhibits had been subjected to a proper chain of custody, and although they had been previously tested, new tests were now available. Defendant specified the type of testing he was requesting to be short tandem repeats (STR), polymerase chain reaction (PCR), and restriction fragment length polymorphism (RFLP).

On September 4, 2008, the trial court *sua sponte* denied defendant's motion on two grounds: first, the common law record showed that a similar section 116-3 motion was previously filed and had been denied on April 26, 2006, and second, that the evidence defendant wanted tested had already been subjected to forensic DNA analysis, the results of which were presented at trial. Defendant now appeals form the September 4, 2008, denial of his second section 116-3 motion for additional testing.

## II. ANALYSIS

On appeal, defendant contends that the trial court erred in denying his section 116-3 motion because he satisfied all the requirements for additional testing. The State responds that principles of *res judicata* procedurally barred defendant from pursuing what is now his section

116-3 motion raising issues already adjudicated, and that in any event his petition failed to meet section 116-3's requirements for additional DNA testing.

### 1. *Res Judicata*

As mentioned above, the trial court cited two grounds for denying the August 4, 2008, section 116-3 motion. The first was that a previous motion on the same subject was denied on April 26, 2006. Defendant apparently filed a section 116-3 motion on April 20, 2006, which is not included in the record, and the trial court apparently ruled on such motion, although that order is not in the record on appeal. However, we note that this court recently found, in People v. Bailey, 386 Ill. App. 3d 68, 72 (2008):

> "There is no language in section 116-3 indicating that the
>
> legislature intended to limit the number of motions for forensic
>
> testing that a defendant could file. If the legislature had wished to
>
> impose such a limit, it could easily have done so. 'It is not the
>
> prerogative of this court to read into the statute of limitations that
>
> the legislature chose not to include.' People v. Rokita, 316 Ill.
>
> App. 3d 292, 303 (2000). Accordingly, we conclude that section
>
> 116-3 simply does not impose a limit on the number of forensic
>
> testing motions a defendant may file."

Accordingly, successive section 116-3 motions are not impermissible. However, *res judicata* would still bar a successive section 116-3 motion if the exact same issue was raised in both motions. See People v. Luczak, 374 Ill. App. 3d 172, 178 (2007). However, we do not

know what issue was raised in the first motion since it is not part of the record.

We are aware that the responsibility for preserving a sufficiently complete record of the proceedings before the trial court rests with the defendant, as the appellant, and where the record on appeal is incomplete, any doubts arising from that incompleteness will be construed against the defendant, and every reasonable presumption will be taken in favor of the judgment below. People v. Banks, 378 Ill. App. 3d 856, 861 (2007). However, as defendant points out, *res judicata* is an affirmative defense. Where a party fails to present evidence in support of its affirmative defense, it has waived the defense. Baylor v. Thiess, 2 Ill. App. 3d 582, 584 (1971). Here the State has failed to proved evidence to prove defendant's first section 116-3 motion raised the exact same issue as his second motion. Accordingly, we will review the trial court's denial of defendant's most recent section 116-3 motion.

## 2. Section 116-3

We now turn to defendant's contention that the trial court improperly denied his second section 116-3 motion. Specifically, defendant claims that he satisfied all the requirements for additional testing. Section 116-3 states in pertinent part:

> "(a) A defendant may make a motion before the trial court
>
> that entered the judgment of conviction in his or her case for the
>
> performance of *** forensic DNA testing, including comparison
>
> analysis of genetic marker groupings of the evidence collected by
>
> criminal justice agencies pursuant to the alleged offense, to those
>
> of the defendant, to those of other forensic evidence, and to those

maintained under subsection (f) of Section 5-4-3 of the Unified

Code of Corrections [(730 ILCS 5/5-4-3)], on evidence that was

secured in relation to the trial which resulted in his or her

conviction, and :

(1) was not subject to the testing which is now

requested at the time of trial; or

(2) although previously subjected to testing, can be

subjected to additional testing utilizing a method that was

not scientifically available at the time of trial that provides

a reasonable likelihood of more probative results. ***

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial which resulted

in his or her conviction; and

(2) the evidence to be tested has been subject to a

chain of custody sufficient to establish that it has not been

substituted, tampered with, replaced, or altered in any

material aspect.

(c) The trial court shall allow the testing under reasonable

conditions designed to protect the State's interests in the integrity

of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific

potential to produce new, noncumulative evidence materially

relevant to the defendant's assertion of actual innocence even

though the results may not completely exonerate the defendant;

(2) the testing requested employs a scientific

method generally accepted within the relevant scientific

community." 725 ILCS 5/116-3 (West 2008).

Accordingly, section 116-3 allows a defendant to have physical evidence subjected to scientific testing that was not available at the time of trial if certain requirements are met. "To obtain testing, a defendant must present a *prima facie* case that identity was the issue at his trial and that the evidence tested has been under a secure chain of custody." People v. Savory, 197 Ill. 2d 203, 208 (2001). Both parties concede that defendant has established a *prima facie* case that identity was at issue in his trial and that the evidence which he seeks to test was subject to a secure chain of custody.

If a defendant can establish his *prima facie* case for section 116-3 testing, as he has done here, he must then establish that the testing requested was scientifically unavailable at the time of his trial. 725 ILCS 5/116-3(c)(1) (West 2006). Defendant argues that although the three pieces of evidence (the fingernail piece, the vaginal swab, and the rectal swab) were previously subjected to PCR testing, the evidence can now be subjected to additional testing, specifically "Short Tandem Repeat (STR) testing, mitochondrial DNA testing, and Y-STR DNA testing," which were allegedly not scientifically available at the time of trial and provide a reasonable likelihood of more probative results.

13

The State responds that defendant's section 116-3 motion merely requested STR, PCR, and RFLP testing, while failing to request Y-STR or mitochondrial DNA testing, and therefore his requests for Y-STR and mitochondrial DNA testing should be waived. We agree. As just mentioned, after establishing a *prima facie* case, defendant's next step in making a proper section 116-3 motion to the trial court is to establish that the testing requested was scientifically unavailable at the time of his trial. 725 ILCS 5/116-3(c)(1) (West 2006). In this case the trial court denied defendant's motion with regards to STR, PCR, and RFLP testing, finding that the evidence had already been subjected to adequate DNA testing. Therefore the only issue on appeal is whether it was proper for the trial court to deny defendant's request for STR, PCR, and RFLP testing. We cannot say how the trial court would have ruled if defendant had asked for Y-STR or mtDNA testing, because that issue has not yet appeared before the trial court. Accordingly, such requests are waived. See, *e.g.*, People v. Johnson, 154 Ill. 2d 227, 233 (1993) (finding that in the postconviction context, any claim not raised in the original or amended petition is deemed waived).

Moreover, we note that defendant's trial took place in March of 2005, at which point all three of the DNA procedures requested in defendant's original motion, plus the two tests he now requests on appeal, had been judicially recognized as generally accepted by the relevant scientific community. Even defendant admits as much in his brief, stating:

"Since the testing of the samples in the instant case in

March 2002, there have been historic scientific developments in

DNA testing, increasing exponentially the reliability of forensic

14

identification over earlier techniques. These tests include Short Tandem Repeat (STR) DNA testing, mitochondrial DNA testing, and Y-STR DNA testing. Brandon L. Garret, *Claiming Innocence*, 92 Minn. L. Rev. 1629, 1658-59 (2008) (noting that STR testing was not widely adopted until the mid to late 1990s, mitochondrial DNA testing invented in the late 1990s, and Y-STR analysis, which permits testing on the Y-chromosome, not adopted until the early 2000s)."

See also People v. Miller, 173 Ill. 2d 167 (1996) (Illinois Supreme Court concluded that RFLP analysis is generally accepted by the relevant scientific community); People v. Pope, 284 Ill. App. 3d 695, 703 (1996) (PCR-based methods of DQ-Alpha typing and polymarker typing for DNA identification are now generally accepted in the relevant scientific community); People v. Rokita, 316 Ill. App. 3d 292, 300 (2000) (STR-based DNA testing is now generally accepted in relevant scientific community). Accordingly, we find that defendant has failed to satisfy the second requirement under section 116-3, that the tests requested were not scientifically available at the time of trial.

Even if we were to find that Y-STR testing and mtDNA testing were not scientifically available at trial, and that defendant's request for such testing was not waived on review, we would nevertheless find that the results of such testing would not have the potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence. See 725 ILCS 5/116-3(c)(1) (West 2006) (if a defendant can establish his *prima facie*

15

case for section 116-3 testing, and can also establish that the testing requested was scientifically unavailable at the time of his trial, it is then incumbent upon the trial court to determine whether "the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence"). "[E]vidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim" and "section 116-3 is not limited to situations in which scientific testing of a certain piece of evidence would completely exonerate a defendant." Savory, 197 Ill. 2d at 213-14. A determination of whether materially relevant evidence of actual innocence would result from forensic testing " 'requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test.' " People v. Travis, 329 Ill. App. 3d 280, 284 (2002), quoting Savory, 197 Ill. 2d at 214.

With regard to the mtDNA testing, defendant does not explain why mtDNA testing would likely have the scientific potential to produce new, noncumulative evidence materially relevant to his actual innocence claim. As a matter of fact, defendant only mentions mtDNA testing twice in his opening brief, without any accompanying explanation of what it is or what specific benefits such testing would lead to, and does not discuss the "materially relevant" aspect of the analysis at all. Bare assertions unsupported by argument or citation to legal authority are deemed waived. Hillblom v. Ivancsits, 76 Ill. App. 3d 306, 312 (1979); see also Niedermeyer v. Streamwood Park District, 3 Ill. App. 3d 1078 (1972) (reviewing courts should disregard conclusions of law or conclusions of material fact unsupported by specific factual allegations).

With regard to Y-STR testing, the thrust of defendant's argument is that the tests done at

the time of trial, particularly on the two fingernail swabs, did not yield conclusive enough results. At trial, Pfofser testified that the first fingernail swab contained two DNA profiles, one consistent with defendant and the other consistent with the victim. Specifically, Pfofser testified that defendant could not be excluded from the male profile, which occurs at a frequency of 1 in 80 black males, 1 in 380 white males, and 1 in 320 Hispanic males. With respect to the second fingernail swab, Pfofser testified that the occurrence rate on that profile was one 1 in 9,800 black individuals, 1 in 77,000 white individuals, and 1 in 99,000 Hispanic individuals.

Defendant contends that the DNA test performed prior to trial were not sufficient. He argues that "Y-STR is particularly necessary in the instant case given the presence of mixed profiles on evidence." Specifically, defendant argues that Y-STR testing "resolves the problem of masking by using only the male chromosome." Defendant urges that the "development of Y-STR in recent years means the swabs in the instant case can be subjected to additional testing that provide a reasonable likelihood of more probative results."

The State agrees that Y-STR testing, "because it targets only the DNA of the male Y-chromosome, is well-suited for mixed-gender samples," citing J. Butler, *Fundamentals of Forensic DNA Typing* 366 (2009). The State contends, however, that defendant is wrong in his assertion that Y-STR testing will produce statistical results that are more probative than the existing statistics gleaned at trial from PCR testing.

A cursory review of the widely accepted and commonly understood theory and technology of DNA profiling is appropriate here. In its earliest form, DNA forensic technology focused on those parts of the DNA molecule where there is a significant variation of base pair

No. 1-08-2679

patterns. People v. Miller, 173 Ill. 2d 167, 184-85 (1996). Over the years, the technology evolved and now focuses on a class of polymorphisms in DNA called "short tandem repeats" (STRs), which are shorter in base pair length. STRs are readily amplified by a process known as "polymerase chain reacion" (PCR) technology. The number of repeats in STR markers can be highly variable among individuals, which make them particularly desirable for identification determinations. See J. Butler, *Forensic DNA Typing: Biology & Technology Behind STR Markers* 53 (2001). The current technology of STRs focuses on the small noncoding regions of the DNA molecule. The number of repeats of a specific STR sequence present at a given locus, combined over a deisngated number of loci, creates a unique DNA "profile" of an individual. J. Butler, *Forensic DNA Typing: Biology & Technology Behind STR Markers* 18 (2001).

In the instant case, Pfofser testified that she examined the DNA evidence using two testing kits - ProFiler and Cofiler - both of which are commercial PCR/STR typing kits. See J. Butler, *Fundamentals of Forensic DNA Typing* 158 (2010) (the two kits rely on PCR amplification and together create an STR marker profile across 13 core loci). Pfofser also testified that she entered the DNA profile of the vaginal swab into the Combined DNA Indexing System (CODIS), which registers only STR-based profiles. J. Butler, *Forensic DNA Typing: Biology & Technology Behind STR Markers* 62 (2001).

Y-STR testing examines the Y chromosome that passed from father to son. Y-STRs are short repeats found solely in the male-specific Y chromosome that code for male sex determination, spermatogenesis, and other male-related functions. "The technique was developed in part to identify a male contributor or contributors in cases of sexual assault, where

18

DNA from both the female and male [] is present in a vaginal swab." J. Epstein, *"Genetic Surveillance" - The Bogeyman Response to Familial DNA Investigations*, U. Ill. J. Tech. & Pol'y 141, 148 (Spring 2009). The technique may also be used in cases with fingernail scrapings comprised of cells from the female victim and cells from the perpetrator.

However, Y-STR testing cannot establish who the singular contributor of a crime scene source is, as the male chromosome traits may be found across people in a population as well as within a family. "This methodology has also received mixed responses judicially in terms of its admissibility at trial." U. Ill. J. Tech. & Pol'y at 148. The main value of the test is that it has the power to include an individual as a possible contributor of a crime scene, or to conclusively exclude him from the pool of possible suspects. U. Ill. J. Tech. & Pol'y 141at 147-49. However, because a match between a suspect and evidence only means that the individual in question could have contributed to the forensic stain, Y-STR testing is not as compelling as an STR profile. See J. Butler, *Fundamentals of Forensic DNA Typing* 364-66 (2010).

Thus far, there are no Illinois cases that have found Y-STR testing to be admissible at trial, and there is nothing to suggest that the Y-STR testing would yield more probative results than the PCR method employed in this case, which extracted an STR profile. Accordingly, defendant has failed to show how Y-STR testing would have the potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence. 725 ILCS 5/116-3(c)(1) (West 2006).

### III. CONCLUSION

For the foregoing reasons we affirm the judgment of the circuit court of Cook County.

Affirmed.

TOOMIN, P.J., and LAVIN, J., concur.