959 N.E.2d 72 (2011)
355 Ill. Dec. 44
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Michael SLOVER, Jr., Michael Slover, Sr., and Jeanette Slover, Defendants-Appellants.
No. 4-10-0276.
Appellate Court of Illinois, Fourth District.
September 9, 2011.
Rehearing Denied October 17, 2011.
D. Peter Wise (argued), of Gates, Wise & Schlosser, P.C., of Springfield, J. Steven Beckett (argued), of University of Illinois College of Law, of Champaign, and Monica Hawkins, of Hawkins & Root, P.C., of Decatur, for appellants.
Jack Ahola, State's Attorney, of Decatur (Patrick Delfino, Robert J. Biderman, and Denise M. Ambrose (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

*73 OPINION
Justice COOK delivered the judgment of the court, with opinion.
¶ 1 Defendants, Michael Slover, Sr., Jeanette Slover, and Michael Slover, Jr., appeal from the trial court's denial of their motion for forensic testing under section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2008)). Defendants argue the court erred by finding that the fingerprint testing they requested would lack "the scientific potential to produce new, noncumulative evidence materially relevant to [their] assertion of actual innocence." 725 ILCS 5/116-3(c)(1) (West 2008). We disagree and affirm.

¶ 2 I. BACKGROUND
¶ 3 In May 2002, a jury found defendants guilty of the first degree murder of Michael, Jr.'s ex-wife, Karyn Slover. Michael, Sr., and Michael, Jr., were also convicted of concealing the homicide. The trial court sentenced each defendant to 60 years in prison for murder and sentenced Michael, Sr., and Michael, Jr., to consecutive 5-year terms for concealment. This court affirmed on direct appeal. People v. Slover, No. 4-02-0587 (June 30, 2005) (unpublished order under Supreme Court Rule 23).
¶ 4 In December 2009, defendants moved to reinstate their previously filed motion for fingerprint testing under section 116-3. This motion concerned certain forensic evidence obtained in the course of Karyn's homicide investigation: namely, latent fingerprints discovered on a Hardee's bag found in the car Karyn was driving on the day of her disappearance and a latent fingerprint found on the guardrail of the bridge from which, investigators believed, Karyn's dismembered body was dumped into the lake where it was later discovered. Defendants sought an order requiring the fingerprints to be run through the Integrated Automated Fingerprint Identification System (IAFIS) operated by the Federal Bureau of Investigation (FBI). The motion also alleged information regarding the Automated Fingerprint Identification System (AFIS) maintained by the Illinois State Police (ISP). Defendants alleged the fingerprint testing had the potential of identifying a viable alternative suspect and, thus, corroborating defendants' claim of actual innocence.
¶ 5 In February 2010, the trial court held a hearing on defendants' section 116-3 motion. The State agreed to have the fingerprints from the Hardee's bag run through the FBI's IAFIS. The court heard testimony from four witnesses on the guardrail fingerprint and the development, implementation, and use of the ISP's AFIS, as follows.
¶ 6 AFIS is a system of storing and organizing fingerprints. In part, it was designed to enable law-enforcement personnel to identify the source of latent fingerprints by matching them to prints of known individuals stored in AFIS's database. This database is comprised of more than 6 million people's fingerprintsabout 60 million individual prints, in all. As of 1999 or 2001, AFIS has three algorithms for conducting searches of its database. As a result of the expansion of the database and the development of new algorithms, AFIS is increasingly effective in matching crime-scene fingerprints to prints already stored in its database.
¶ 7 Only ISP fingerprint examiners are authorized to perform an AFIS search. A fingerprint examiner conducting an AFIS search on a latent print scans an image or a tracing of the print into the computer; isolates its high-quality area; pinpoints its "core"; orients it along a vertical "axis"; *74 locates the "points," or "points of minutiae," or "points of comparison"areas where a ridge ends or bifurcates; identifies the print's pattern type; and identifies, if possible, which finger on which hand made the print. Computers are unable to identify the core, axis, points, pattern type, and finger; an examiner must provide this information to the computer executing the search. Identifying the pattern type and finger narrows the scope of the search so only a corresponding subset of AFIS's 60 million prints is searched. AFIS employs an algorithm or algorithms selected by the examiner to compare the latent fingerprint to those stored in its database based on the relative locations of the core, axis, and points. It assigns a score to each searched print reflecting the relative likelihood of matching it to the latent print. No matter the quality or quantity of the information submitted or the likelihood of obtaining a match, AFIS provides a list of the 10 highest scoring stored fingerprints, along with a computer image of each print and identifying information on the person to whom the print belongs, such as his or her name, sex, race, and age. The examiner compares computer printouts of the 10 potential matches to the latent print to determine whether any of the stored prints can be positively eliminated as a match; if a print cannot be eliminated as a possible match, then the examiner requests its original to be sent from a central facility for further comparison.
¶ 8 In addition to this background testimony, the trial court heard testimony by the State's and defendants' experts debating the "suitability" of the guardrail fingerprint for AFIS testing. Kenneth Moses, an expert for defendants, was director of Forensic Identification Services, an independent forensics laboratory in San Francisco. Moses testified he studied the ISP's standards for AFIS comparison of latent fingerprints and concluded the guardrail print was suitable to be run through AFIS. He opined the print came from the upper part of a thumb. From an image of the print provided to him by defendants, Moses identified 13 points the ISP's guidelines recommend that a minimum of 8 be identified. Although the core was not visible in the available portion of the print, Moses recommended running the print through AFIS two or three times with different estimations of the core's location and the axis's orientation. These estimations would be "a lot more than guess[es]" as they would reflect Moses's experience examining thousands of fingerprints.
¶ 9 Mary McCarthy, the State's expert, was the latent print training coordinator for the ISP. She testified she determined the guardrail print was unsuitable for AFIS testing. She could definitively identify only about six points on the print. Other possible points were unclear or obscured and would have been cropped out if she were going to search for the print in AFIS. Further, some points seemed so high up on the finger that, McCarthy opined, they were unlikely to be included in any fingerprint stored in AFIS's database. She explained stored fingerprints often omit the fingertip due to the finger's curvature. McCarthy testified she was unable to determine the core's location and the axis's orientation and to identify the pattern type. Her training taught her not to guess the location of points or the core, the orientation of the axis, or the pattern type. McCarthy explained latent fingerprints with no identifiable pattern type should not be searched in AFIS. She testified Moses's proposed method of conducting multiple searches using different estimations of the core and axis was contrary to her training.
*75 ¶ 10 In March 2010, the trial court denied defendants' motion in a written judgment. The court explicitly found McCarthy's testimony more credible than Moses's. The court found the guardrail print was unsuitable for AFIS testing and concluded "there is no potential to produce new evidence materially relevant to the defendants' assertion of actual innocence." Alternatively, the court concluded any evidence resulting from the testing would have been cumulative, referring to the fact that, before the trial, defendants, Karyn, and the ISP's crimescene personnel had been eliminated as the source of the print. It wrote, "Defense counsel persistently [c]ited the * * * unidentified latent fingerprint on the bridge in unsuccessfully arguing that reasonable doubt existed."
¶ 11 This appeal followed.

¶ 12 II. ANALYSIS
¶ 13 The parties initially dispute the appropriate standard of review. Courts have consistently reviewed de novo the disposition of a section 116-3 motion. See, e.g., People v. Pursley, 407 Ill.App.3d 526, 529, 347 Ill.Dec. 808, 943 N.E.2d 98, 102 (2011); People v. Hockenberry, 316 Ill.App.3d 752, 755, 250 Ill.Dec. 111, 737 N.E.2d 1088, 1091 (2000); People v. Urioste, 316 Ill. App.3d 307, 310, 249 Ill.Dec. 512, 736 N.E.2d 706, 710 (2000). In Hockenberry, 316 Ill.App.3d at 755-56, 250 Ill.Dec. 111, 737 N.E.2d at 1091, for example, the appellate court explained its use of the de novo standard as follows: "Such a standard is appropriate because the trial court's decision on such a motion is necessarily based upon its review of the pleadings and the trial transcripts and is not based upon its assessment of the credibility of the witnesses. [Citation.] Accordingly, the trial court is not in a better position than the reviewing court to decide the merits of the defendant's motion." The present case is distinguishable from previous cases applying section 116-3 in that the trial court heard testimony on defendants' motion and based its ruling, in part, on its assessment of the witnesses' credibility. We therefore agree with the parties that de novo review is inappropriate in this case.
¶ 14 In lieu of the de novo standard, the State urges us to review the trial court's judgment under the manifestly erroneous standard employed in reviewing third-stage postconviction proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 through 122-8 (West 2008)) in which a hearing has been held. See People v. Beaman, 229 Ill.2d 56, 72, 321 Ill. Dec. 778, 890 N.E.2d 500, 509 (2008) ("Following an evidentiary hearing where factfinding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous."). In that context, reviewing courts apply the manifestly erroneous standard in recognition of "the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotation marks omitted.) People v. Coleman, 183 Ill.2d 366, 384, 233 Ill.Dec. 789, 701 N.E.2d 1063, 1073 (1998).
¶ 15 Defendants ask that we apply the two-part standard of review used in appeals from a trial court's ruling on a motion to suppress. In such an appeal, the trial court's factual findings are upheld unless against the manifest weight of the evidence; its ultimate ruling on whether to suppress is reviewed de novo. People v. Oliver, 236 Ill.2d 448, 454, 338 Ill.Dec. 901, 925 N.E.2d 1107, 1110 (2010).
*76 ¶ 16 We adopt the manifestly erroneous standard of review in this case. Conceptually, our review of section 116-3 proceedings in which a hearing has been held are more analogous to that of third-stage postconviction hearings than to appeals from suppression-of-evidence proceedings. This similarity between cases under section 116-3 and other postconviction proceedings favors applying the manifestly erroneous standard of review in appeals from those proceedings while reserving the unique two-part standard of review for fourth-amendment jurisprudence. We note, however, that in this case our conclusion would be the same under either of the proposed standards.
¶ 17 Applying the manifestly erroneous standard of review, we will affirm the trial court's judgment unless it is manifestly erroneous. Beaman, 229 Ill.2d at 72, 321 Ill.Dec. 778, 890 N.E.2d at 509. "A ruling is manifestly erroneous only if it contains error that is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) People ex rel. Madigan v. Petco Petroleum Corp., 363 Ill.App.3d 613, 623, 299 Ill.Dec. 333, 841 N.E.2d 1065, 1073 (2006).
¶ 18 Next, citing People v. Barker, 403 Ill.App.3d 515, 524, 342 Ill.Dec. 746, 932 N.E.2d 1207, 1215 (2010), the State asserts defendants forfeited their request to have the guardrail fingerprint run through the ISP's AFIS by including in their section 116-3 motion only a request to have it run through the FBI's IAFIS. In Barker, the trial court denied the defendant's section 116-3 motion for several specific types of deoxyribonucleic acid (DNA) testing. Id. The appellate court found the defendant waived his requests for any method of DNA testing not initially requested in his motion, including two methods he requested for the first time on appeal. Id. at 524-25, 342 Ill.Dec. 746, 932 N.E.2d at 1215.
¶ 19 In this case, as the State acknowledges, the evidence and arguments presented in defendants' section 116-3 motion concerned the suitability of the guardrail fingerprint for testing in the ISP's AFIS, not the FBI's IAFIS. The parties and the trial court treated the motion as a request for AFIS testing, notwithstanding defendants' initial request for IAFIS testing and some apparent confusion over the similar acronyms. Barker is therefore inapposite here; because they presented it in such a fashion that the State responded to it and the court ruled on it, defendants' request for AFIS testing was not forfeited.
¶ 20 We turn now to the merits of defendants' assertion that the trial court erred. The parties primarily dispute whether, as required by section 116-3(c)(1), AFIS testing on the guardrail fingerprint had "the scientific potential to produce new, noncumulative evidence materially relevant to [defendants'] assertion of actual innocence." As our resolution of this issue is dispositive, we do not examine whether defendants satisfied the other requirements of section 116-3.
¶ 21 The trial court in this case concluded the guardrail fingerprint was unsuitable for an AFIS search, relying primarily on McCarthy's testimony. The court found compelling McCarthy's explanation that the quality of the print was insufficient for AFIS testing as the print lacked an identifiable pattern type and core. Based on this evidence, the court concluded defendants failed to satisfy section 116-3(c)(1).
¶ 22 This conclusion is not manifestly erroneous. The trial court executed its function, as trier of fact, of resolving conflicts between the parties' experts, and its reliance on the State's expert over defendants' does not render its decision erroneous. See People v. Gray, 121 Ill.App.3d *77 867, 870, 77 Ill.Dec. 298, 460 N.E.2d 354, 356 (1984) ("In all situations in which experts are called to testify, their comparative credibility and the weight to be accorded to their testimony is a matter for the trier of fact to determine." (Internal quotation marks omitted.)). If, as the court determined, the fingerprint was of insufficient quality to perform an adequately controlled AFIS search, then, within the meaning of the statute, the requested testing lacked the scientific potential to produce relevant evidence. That is, while the requested search could conceivably result in the discovery of material evidence, this discovery would be unattributable to the scientific rigors of the testing. Such a shot in the dark is not the kind of forensic testing required in appropriate circumstances by section 116-3.
¶ 23 Defendants cite Hockenberry for the proposition that section 116-3 establishes a low hurdle for allowing a forensic test. Whether such a principle can be gleaned from the cases interpreting section 116-3 is irrelevant. While Hockenberry and the other cases cited by the parties discuss issues related to section 116-3, such as when identity is at issue in a case or what it means for evidence to be materially relevant to a petitioner's claim of actual innocence, the parties have cited, and our research has uncovered, no case specifically addressing the matter at hand: namely, the viability of the evidence in relation to the requested testing. As they do not address this narrow issue, the cases cited by the parties are inapposite.
¶ 24 Finally, as the trial court's judgment can be affirmed on its determination that the guardrail print is scientifically unamenable to the requested testing, we need not consider defendants' argument regarding the court's alternative rationale for denying their motion.

¶ 25 III. CONCLUSION
¶ 26 For the foregoing reasons, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendants as costs of this appeal.
¶ 27 Affirmed.
Justices STEIGMANN and POPE concurred in the judgment and opinion.