2020 IL App (1st) 172054-U

No. 1-17-2054

Order filed June 18, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 21614 |
| | ) | |
| DAVID BROWN, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's denial of defendant's *pro se* postconviction motion for DNA testing where he failed to show that further forensic testing would materially advance his claim of actual innocence.

¶ 2    Defendant David Brown appeals from the trial court's order denying his *pro se* postconviction motion for DNA testing pursuant to section 116-3 of the Code of Criminal Procedure (725 ILCS 5/116-3 (West 2016)). On appeal, he contends the court erroneously denied

his motion because he established a *prima facie* case for DNA testing. For the following reasons, we affirm.

¶ 3    Following a bench trial, defendant was convicted of the first degree murder (720 ILCS 5/9-1(a)(2), (b)(16) (West 2012)) of 81-year-old Gertrude Franklin, possession of a stolen motor vehicle, and aggravated fleeing. He was sentenced to life imprisonment for the murder, 30 years' imprisonment for possession of a stolen motor vehicle, and 6 years' imprisonment for aggravated fleeing, to be served consecutively to his life term. We affirmed on direct appeal. *People v. Brown*, 2016 IL App (1st) 140260-U. We set forth the facts in defendant's direct appeal and recite them here to the extent necessary to our disposition. The evidence at trial established that Franklin drove home from a party in her tan Buick Century around midnight on October 28, 2009. She lived at a residence on the 1000 block of Barnsdale Road in LaGrange Park. Franklin's great nephew Michael Love accompanied her home, following behind her in his car. Love learned the next day that Franklin was transported to the hospital and that she passed away on November 12, 2009 due to her injuries.

¶ 4    Officer Darren Pedota was on duty around 4:00 a.m. on October 29, 2009, when he pulled over a tan Buick, which he knew belonged to Franklin, who lived a half block away. Defendant was driving the car. After stopping and opening the driver's side door, defendant saw Pedota and quickly sped away. He eventually crashed into a tree and subsequently "fell out" of the car. Podeta recovered from defendant's pockets several watches, a bracelet or necklace, other jewelry, a set of keys, and a black coin purse. Defendant was thereafter transported to the hospital.

¶ 5    In response to a 911 call, Officer Matthew Fellers reported to a residence on Barnsdale around 7:15 a.m. on October 29, 2009. The back door had been broken from a "forced entry" and

a woman he recognized as Franklin was lying on the kitchen floor with "a large pool of blood around her head and face." Franklin was wearing a robe or nightgown, her "feet were bound together," and "she also had binding on her *** left wrist area." Because she was nonresponsive, Fellers had her transported to the hospital.

¶ 6    Firefighter and paramedic Christopher Baudler responded to a dispatch at Franklin's address around 7:15 a.m. on October 29, 2009. Upon arrival, he saw a woman facedown with her hands and feet bound and obvious "facial trauma." Her left arm was bound with a gray necktie and her legs were bound with a black necktie. There was a large pool of blood by her face, which had been "completely smashed in" and was "as flat as *** a pan." When Baudler rolled Franklin over to check her breathing, she let out "an agonal gasping breath."

¶ 7    Police crime scene investigator Sean Grosvenor processed the crime scene. He testified that he observed "a pool of blood like substance" on the kitchen floor. A coffee cup was on the floor nearby. There was blood-spatter on the oven and cabinets. "[B]lood like stains" led from the kitchen to the bedroom, where "there were several jewelry boxes that were open, items scattered on the bed," and the jewelry boxes were partially empty. A lottery ticket recovered from the bedroom had a "partial footwear impression in a blood like stain." Grosvenor obtained footprint impressions from the bloodstains and the lottery ticket, which matched the tread on defendant's shoes. Grosvenor photographed some smoked cigarette butts on the sidewalk outside of Franklin's home but did not inventory or submit them for forensic testing.

¶ 8    Grosvenor also processed a gold Buick with front-end damage, Franklin's clothing and defendant's clothing. Defendant's jeans and shoes had "several blood like stains" and there was a "blood like stain" on his coat. There was blood present inside Franklin's vehicle. The coffee cup

recovered from Franklin's kitchen showed "dried blood like stain on all sides, including the interior and the bottom." Grosvenor photographed Franklin while she was in her hospital bed, and described her as unconscious and on a ventilator with bruises, abrasions, and lacerations to her face and head.

¶ 9    William Anselme, an expert in the field of forensic biology, testified there was blood on defendant's shoe, the coffee mug, and the lottery ticket.

¶ 10    Christopher Webb, an expert in the field of forensic biology and DNA analysis, testified that he performed DNA analysis in this case in both 2009 and 2011. He used the polymerase chain reaction (PCR) method both times, but the science changed between 2009 and 2011. In 2009, he used a system that examined 13 locations on a DNA strand, which consisted of 12 short tandem repeats (STRs) and 1 genetic marker. In 2011, Webb used an updated system which looked at 15 STRs and 1 genetic marker. Other than the additional loci in the 2011 test, the method of testing was the same in both 2009 and 2011. All analysis methods utilized were generally accepted in the scientific community.

¶ 11    In 2009, Webb analyzed a swab from a bloodstain on defendant's shoe and a buccal standard from Franklin. He first isolated the DNA from samples and determined how much DNA was present and its condition. Webb concluded there was DNA on the swab from defendant's shoe. He then performed a PCR reaction on that DNA to produce a DNA profile. He successfully obtained a DNA profile from the blood swab on the shoe and compared it with the DNA profile that he obtained in the same way from Franklin's buccal swab. The DNA he extracted from Franklin matched the DNA profile from the blood found on defendant's shoe. The profile would

be expected to occur in approximately 1 in 9.2 quintillion black, 1 in 58 quintillion Hispanic, or 1 in 440 quintillion white unrelated individuals.

¶ 12     In 2011, Webb analyzed a bloodstain from the lottery ticket, a bloodstain from the coffee cup, a swabbing from the coffee cup handle, two swabbings from a portion of a silver and gray necktie, and a buccal standard from defendant. He analyzed the stains from the lottery ticket and coffee cup and the swabbings from the coffee cup handle and the neck tie in the same manner as the items in 2009: by isolating the DNA from samples and determining how much DNA was present and its condition. He performed a different extraction technique on defendant's buccal standard but clarified "it all ends up the same way where the end product of extraction is the isolated DNA, which [he] then determine[d] how much is present, analyze using PCR and genetic analysis to come up with a DNA profile."

¶ 13     The DNA from the bloodstains on the lottery ticket and coffee cup matched Franklin's DNA. The profile from both the ticket and cup would be expected to occur in approximately 1 in 9.2 quintillion black, 1 in 58 quintillion Hispanic, or 1 in 440 quintillion white unrelated individuals. There was no male DNA present on the coffee cup handle swab. Webb did not profile the coffee cup handle swab for female DNA because the victim was female and there was no male DNA present.

¶ 14     Webb used defendant's buccal swab to develop a DNA profile suitable for comparison to the "questioned stains." He obtained a complete profile, and there were no mixtures or abnormalities. The DNA profile extracted from the tie matched defendant's DNA. The profile would be expected to occur in approximately 1 in 800 quintillion black, 1 in 89 sextillion Southwest Hispanic, or 1 in 7 sextillion white unrelated individuals. Webb described the statistics

as measuring "how common or rare the DNA profile would be. So that's the probability of [Webb] finding this DNA profile randomly in a black, Southwest Hispanic, or white population."

¶ 15    On cross-examination, Webb testified that in 2009 he used the Profiler Plus "kit" and a CoFiler test together to create a profile of 13 locations for the DNA obtained from Franklin's buccal swab and the bloodstain on defendant's shoe. Each location has two numbers, one from a person's mother and one from the father. Webb initially used the Profiler Plus to get results from both the buccal swab and the shoe. He acknowledged that based on the results from Franklin's buccal swab, he did not use the results from the Profiler Plus kit because he had "other analyses that [he] could do in order to get more information out of that specific profile." Webb ran the buccal swab "through the genetic analyzer again" by reprepping and reinjecting the swab. He reprepped and reinjected the swab from defendant's shoe two additional times. On the third reanalysis of defendant's shoe, Webb matched the DNA profile to Franklin's buccal swab.

¶ 16    With respect to the CoFiler test on defendant's shoe, Webb performed "three tests" to get a "printout" that could be used from the shoe swab because he observed "dropout," meaning that there appeared to be more information available based on a location on his graph. In order to ensure that he was getting as much information as possible, Webb reprepped and reinjected the swab. After the third test, Webb matched the buccal swab to the bloodstain on defendant's shoe.

¶ 17    In 2011, Webb used the Identifier Plus test on the tie. The initial results required clarification because "[o]nce in a while" the analyzer detects "light coming from various DNA strands" or "some generic dust particle or florescent dye blob" which affects the results. Webb reinjected the sample to obtain a "clean profile," which matched defendant's DNA profile.

¶ 18    On redirect, Webb clarified that his goal in performing the DNA analyses is "to obtain as much information as possible in order to determine if an individual can be included or excluded as contributing to an evidence stain." He was trained in detecting abnormalities during analyses and "then what to do about them." He explained that the abnormalities he encountered during the CoFiler analysis were not unusual. The summary of his results showed a match between the blood on the lottery ticket and the victim, and a match on the DNA extracted from the tie and defendant's DNA. Both the swab from the tie and defendant's buccal swab were "complete DNA profiles" that Webb categorized as "clean profiles." In performing the requisite analyses in the instant case, Webb followed all training procedures and protocols. He was confident with the results obtained from the tests.

¶ 19    Thomas Merchie, an expert in the field of blood spatter analysis, testified that, in March of 2011, he tested shoes and a pair of pants that were recovered from defendant. He determined that the stains on defendant's shoe were impact splatter. Based on the shape of the stains, Merchie concluded that defendant's left shoe and jeans were within a short distance of that impact splatter from a blood source perpendicular to the shoe. He additionally concluded the blood splatter on the shoes and jeans was consistent with "any blunt force trauma including" a coffee cup being struck to a woman's head.

¶ 20    Johanna Jackson, Franklin's great-niece, identified Franklin's jewelry, a watch, keys, and a black coin purse from photographs.

¶ 21    The parties stipulated that (1) Franklin was 81 years old at the time of the attack; (2) no fingerprints were found on the coffee mug; and (3) the medical examiner would testify that

Franklin suffered "[m]ultiple blunt force trauma to the head" and died as a result of "cranial cerebral injuries due to assault."

¶ 22    Defendant testified that Franklin was his aunt. He was in LaGrange on the night of Franklin's attack to purchase marijuana. His "lady friend," whose name he did not know, dropped him off at Franklin's residence around "3:30, 4:00" a.m. so that he could borrow Franklin's car. There were two other people with Franklin, an "elderly" man and woman, who were drinking. Franklin agreed to lend defendant her car on the condition that he return it "between 7:30 and 8:00" a.m.

¶ 23    While driving, defendant noticed a police officer following him. He pulled over, although the officer did not indicate that he needed to. Defendant had marijuana on the seat so he "pulled out" and threw the marijuana out of the window. He lost control of the vehicle because he had been drinking and crashed. Defendant denied having blood on his clothing or his shoes and stated he did not take jewelry from Franklin's house. He stated the jewelry recovered from him was his mother's. Defendant denied any knowledge of a coin purse and denied attacking his aunt. He denied owning a tie and gave no explanation when asked how his DNA was recovered from the tie used to bind Franklin.

¶ 24    In rebuttal, the police officer who interviewed defendant at the hospital after the crash testified that defendant did not state anyone else was at Franklin's house when defendant borrowed her car.

¶ 25    The court found defendant guilty of murder, felony murder (based on residential burglary and robbery), robbery, possession of a stolen motor vehicle, and aggravated fleeing. The court found Franklin's death resulted from exceptionally brutal and heinous behavior indicative of

wanton cruelty. After merging various counts, the court sentenced defendant to three concurrent sentences of life imprisonment for strong probability murder, felony murder based on residential burglary, and felony murder based on robbery. It additionally sentenced defendant to 30 years' imprisonment for possession of a stolen motor vehicle, and 6 years' imprisonment for aggravated fleeing, to be served consecutively to his life terms.

¶ 26    We affirmed on direct appeal but corrected defendant's mittimus to reflect only one count of strong probability murder, finding the counts for felony murder violated the one-act, one-crime doctrine. *Brown*, 2016 IL App (1st) 140260-U.

¶ 27    On March 28, 2016, defendant filed the instant *pro se* motion for DNA testing pursuant to section 116-3. In his motion, defendant asked for forensic testing on "cigarette butts, fingernail clippings, jewelry, ceramic coffee mug, clothing items, and shoes." He alleged that the aforementioned evidence "has been subject to a chain-of-custody to establish that it was not substituted, tampered with, replaced, or altered in any material manner." The jewelry, coffee mug, clothes, and shoes were "admitted at trial" but only the necktie and defendant's pants, shirt, and shoes "were tested using a single method." Franklin's clothes, the fingernail clippings, the jewelry recovered from defendant, the coffee mug, and the cigarette butts were not tested for DNA.

¶ 28    Defendant argued that his DNA was "at issue" and "results of the requested testing have the scientific potential to produce new, noncumulative evidence materially relevant to [his] assertion of actual innocence, even if it is not completely exonerating." He asserted testing the evidence would show his DNA was not on Franklin's clothes, the necktie, the cigarette butts, or under Franklin's fingernail clippings. Further, he argued the testing would reveal Franklin's DNA was not on the recovered jewelry, the coffee mug, or defendant's clothing and shoes. Defendant

argued his clothes and shoes and the neckties used to bind Franklin, while previously tested, could be "subjected to additional testing utilizing a method that was scientifically available at the time of trial which would provide a reasonable likelihood of more probative results." He argued "RFLP and mitochondrial (mtDNA) methods" were examples of methods that could be utilized in testing the evidence.

¶ 29    Defendant alleged that testing Franklin's fingernail clippings would significantly advance his claim of actual innocence, "especially where there was little direct evidence presented at trial."

¶ 30    In a footnote, defendant stated that "[t]he chain of custody for the described evidence is in question, in part where [the detectives and forensic analyst] may not have followed proper procedures as to clothes taken from defendant."

¶ 31    The State responded by filing a motion to dismiss defendant's section 116-3 motion for DNA testing, arguing defendant failed to state a prima facie case for DNA testing and the DNA testing conducted prior to trial in 2009 and 2011 linked defendant to Franklin's murder. Specifically, Franklin's DNA was found on defendant's shoe, the blood on the lottery ticket and coffee mug matched Franklin's DNA, and defendant's DNA was found on the necktie used to bind Franklin. The State argued that, while defendant requested more advanced testing, there was no new testing that could provide new, non-cumulative evidence material to his claim of actual innocence as required by the statute, especially in light of the overwhelming evidence against him. The State attached to its motion laboratory reports dated November 16, 2009, with the results from the forensic testing conducted on defendant's shoe against Franklin's DNA, and May 26, 2011, with results from the forensic testing conducted on the lottery ticket, coffee cup, and necktie against defendant's DNA.

¶ 32    On July 21, 2017, following a hearing, the trial court granted the State's motion to dismiss defendant's motion for DNA testing, finding that testing the requested evidence "would not significantly explain a claim of actual innocence."

¶ 33    On appeal, defendant contends that the trial court erred in denying his motion for DNA testing because he stated a *prima facie* case under section 116-3 for forensic testing and further testing would materially advance his claim of actual innocence.

¶ 34    "Section 116-3 of the Code delineates the prerequisites a defendant must meet in order to establish that he is entitled to, *inter alia*, postconviction forensic DNA testing." *People v. Smith*, 2014 IL App (1st) 113265, ¶ 19. Section 116-3(a) provides that a defendant may make a motion in the trial court for DNA testing "on evidence that was secured in relation to the trial *** which resulted in his or her conviction" if the evidence was either (1) not subject at the time of trial to the requested testing, or (2) previously tested but "can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a) (West 2016). Defendants seeking retesting under section 116-3(a)(2) have a greater burden to establish their case than those where evidence has not been previously tested. *People v. Stoecker*, 2014 IL 115756, ¶ 26.

¶ 35    Under section 116-3(b), the defendant must present a *prima facie* case that "(1) identity was the issue in the trial" that resulted in his conviction, and "(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." 725 ILCS 5/116-3(b) (West 2016).

¶ 36    Additionally, subsection 116-3(c) provides that the trial court shall allow the requested testing upon a determination that: (1) "the result of the testing has the scientific potential to produce

new, noncumulative evidence" that is "materially relevant to the defendant's assertion of actual innocence *** even though the results may not completely exonerate the defendant"; and (2) the requested testing "employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c) (West 2016). We review *de novo* the court's denial of a motion for forensic testing of evidence. *Stoecker*, 2014 IL 115756, ¶ 21.

¶ 37    In this case, defendant requested DNA testing of Franklin's clothes and fingernail clippings, cigarette butts, and the recovered jewelry, which were not tested prior to trial.[1] He also requested additional testing of the necktie and his clothes and shoes, which were previously tested.

¶ 38    We initially note that, with respect to the evidentiary items defendant seeks to have retested, he has failed to show that the testing methods mentioned in his motion were "not scientifically available at the time of trial" as required by section 116-3(a)(2). To the contrary, in his motion defendant acknowledged that the previously tested items "can be subjected to additional testing utilizing a method that *was* scientifically available at the time of trial." (Emphasis added). Defendant then stated, "For example, two DNA testing procedures, RFLP and mitochondrial (mtDNA) methods has [*sic*] been judicially recognized as generally accepted" by the scientific community, citing *People v. Barker*, 403 Ill. App. 3d 515 (2010). Barker in fact shows both of these DNA tests were scientifically available at the time of defendant's 2013 trial. See *Barker*, 403 Ill. App. 3d at 525 (noting mitochondrial DNA testing and RFLP analysis, among other tests, were scientifically available in 2005, at the time of the defendant's trial). Defendant's request for

---

[1] Although defendant claimed there was no prior testing of the coffee mug, the record reveals that the coffee mug was tested prior to trial. The coffee mug tested positive for Franklin's blood, but no male DNA was found on the swab of the handle.

retesting of the necktie and his clothing and shoes, therefore, fails to satisfy the statutory requirements set forth in section 116-3(a)(2). See 725 ILCS 5/116-3(a)(2) (West 2016).

¶ 39    Moreover, even if defendant's motion satisfied section 116-3(a)(2), we find the record establishes defendant's motion does not meet the section 116-3(c) requirement that testing or retesting of the various pieces of evidence has the potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 40    Evidence that is " 'materially relevant' to a claim of actual innocence is simply evidence which tends to significantly advance that claim." *People v. Savory*, 197 Ill. 2d 203, 213 (2001). To determine whether evidence is materially relevant "requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test." *Id.* at 215.

¶ 41    As we noted in defendant's direct appeal, the evidence against him at trial was overwhelming. *Brown*, 2016 IL App (1st) 140260-U, ¶ 26. The evidence established defendant broke into Franklin's home, tied her up, beat her with a blunt object, and left her on the floor while he took her jewelry and car. Defendant was found in Franklin's car driving near her residence on the night of her attack. He fled from a police officer and crashed the car. Defendant was in possession of jewelry that was identified as Franklin's. Defendant's shoes contained blood spatter evidence, and DNA testing revealed that the blood was Franklin's. Defendant's DNA was found on a tie used to bind Franklin during the attack. The footprint on the lottery ticket recovered from the scene had a footprint in Franklin's blood that matched the tread of defendant's shoes.

¶ 42    As to the evidence defendant seeks to test, he requests retesting of the necktie used to bind Franklin and his clothes and shoes. He argues that the DNA analyses performed by forensic analyst

Webb are unreliable, claiming Webb had to perform the 2009 test three times before he was able to obtain a conclusive result which matched Franklin's DNA to the bloodstains on defendant's shoe and twice to obtain a conclusive result showing defendant's DNA on the necktie. We are unpersuaded by this argument. Webb was extensively cross-examined regarding his multiple tests and clarified that he performed multiple analyses in order to get the most information possible, which was his goal when testing evidence. Webb explained that he was trained to detect abnormalities during the testing and then "what to do about them." With respect to the CoFiler test, Webb testified that abnormalities were not unusual. With respect to the Identifier Plus test, he explained that, in certain circumstances, dust or light could impact the results, necessitating "reinjection" to obtain a "clean profile." Although abnormalities in the results necessitated retesting, Webb concluded that the DNA profiles from the blood on the lottery ticket, defendant's shoes, and the coffee mug matched Franklin's DNA profile. He further concluded that the DNA profile extracted from the tie matched defendant's DNA profile, and each of those respective profiles were "complete profiles" and categorized as "clean." Importantly, Webb testified that all methods used were in accordance with protocol and generally accepted in the scientific community, and he was confident in the results of the tests.

¶ 43    We acknowledge defendant's argument on appeal that scientific advancements have occurred between 2009 and 2016 when defendant filed his motion for DNA testing, and indeed between the 13-loci test Webb used in 2009 and the 16-loci test he used in 2011. However, the statistics Webb testified to showed a strong probability that (1) defendant's DNA was on the tie used to bind Franklin (1 in 800 quintillion black, 1 in 89 sextillion Southwest Hispanic, or 1 in 7 sextillion white unrelated individuals); and (2) Franklin's blood was found on defendant's shoe,

the lottery ticket, and the coffee mug (1 in 9.2 quintillion black, 1 in 58 quintillion Hispanic, or 1 in 440 quintillion white unrelated individuals). Defendant has not shown that the results from those tests are no longer reliable. Therefore, additionally testing would not significantly advance his claim of actual innocence given the great statistical likelihood that defendant's DNA was present on the tie and Franklin's DNA was present on defendant's shoe. Accordingly, defendant failed to show that retesting has the "potential to produce new, noncumulative evidence" that is materially relevant under section 116-3(c).

¶ 44 We likewise reject defendant's argument that testing Franklin's clothes and fingernail clippings, the cigarette butts, and the recovered jewelry would significantly advance his claim of actual innocence given the substantial evidence against him. As the State argues, the cigarette butts photographed outside Franklin's house were not inventoried, and nothing suggests that they were connected in any way to the attacker given the absence of evidence regarding when they were dropped. Moreover, testing the rest of the requested evidence would not diminish the evidence that tied defendant to the scene of Franklin's attack. In other words, forensic testing on Franklin's clothes, jewelry, and fingernail clippings, even if it revealed a third party's DNA, does not negate the presence of defendant's DNA on the tie used to bind Franklin's arms or Franklin's blood spatter on defendant's shoe, which indicated he was present at the time of the attack. In light of the overwhelming evidence against defendant at trial and his failure to show that further forensic testing would produce new, noncumulative evidence materially relevant to his claim of actual innocence, we affirm the trial court's denial of his motion for DNA testing pursuant to section 116-3. *Savory*, 197 Ill. 2d at 213.

¶ 45 We affirm the judgment of the circuit court of Cook County.

¶ 46    Affirmed.