# Illinois Official Reports

## Appellate Court

---

### *People v. LaPointe*, 2018 IL App (2d) 160432

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PHILLIP E. LaPOINTE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0432 |
| Filed<br>Rehearing denied | August 28, 2018<br>October 16, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 78-CF-317; the Hon. Robert A. Miller, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd and Thomas A. Lilien, of State Appellate Defender's Office, of Elgin, and Paul J. Glaser, of Enka, North Carolina, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, of counsel), for the People. |

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    In 1978, defendant, Phillip E. La Pointe, pleaded guilty to murder (Ill. Rev. Stat. 1977, ch. 38, ¶ 9-1(a)(1)) and was sentenced to life imprisonment. In 2016, having filed an unsuccessful direct appeal and numerous unsuccessful collateral actions, he moved under section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2016)) to allow fingerprint and DNA analysis of certain items of evidence that had been secured in relation to his plea and conviction. The State did not respond. The trial court denied the motion as barred by *res judicata*. On appeal, defendant contends that *res judicata* did not bar his motion and that he made a *prima facie* case for testing the evidence. We reverse and remand.

¶ 2    On March 7, 1978, Peter Moreno, a taxicab driver, was murdered. On June 16, 1978, defendant pleaded guilty to the offense. At the hearing, the State provided the following factual basis. According to David Cichelli, on the morning of March 7, 1978, defendant visited him at the gas station where Cichelli worked and told him that he was going to rob and kill a cab driver. He showed Cichelli a loaded .22-caliber revolver. Shortly afterward, defendant left, walked two blocks, and called for a cab. Moreno arrived, picked up defendant, and drove to the area of York Commons. Defendant shot Moreno twice in the head with the revolver. Defendant then drove the cab, with Moreno's body inside, a short distance and left it there. Defendant took some money from Moreno, returned to the gas station, and told Cichelli that he had killed Moreno because Moreno could identify him. Later that day, the police found the cab with Moreno dead inside.

¶ 3    The factual basis continued as follows. On March 8, 1978, defendant was arrested. At the police station, he admitted that he had called for the cab, that he was in the cab when he heard two shots fired, and that only he and Moreno had been in the cab then. Defendant said that the gun was in his home. The police searched the home and found the gun. When defendant shot Moreno, he was not under the influence of drugs or experiencing any mental incapacity that negated the intent required for murder.

¶ 4    The trial court sentenced defendant to life imprisonment, based on a finding that the murder was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty (see Ill. Rev. Stat., 1978 Supp., ch. 38, ¶ 1005-8-1(a)(1)). Defendant moved to reconsider the sentence but not to withdraw the plea. The court denied the motion. On appeal, we held that the court's finding of exceptionally brutal or heinous conduct had been erroneous, and we reduced his sentence to 60 years. *People v. LaPointe*, 85 Ill. App. 3d 215, 218-19, 224 (1980). The supreme court reversed us and affirmed the trial court. *People v. La Pointe*, 88 Ill. 2d 482, 493, 502 (1981).

¶ 5    Of defendant's numerous collateral actions, we recount those that are most pertinent here. In 2002, defendant petitioned for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2002)), alleging that his trial counsel had been ineffective in numerous respects, including failing to investigate whether defendant had been under the

influence of LSD on March 7, 1978, and failing to honor his request to move to withdraw his guilty plea. The trial court summarily dismissed the petition. We affirmed. *People v. LaPointe*, 341 Ill. App. 3d 1118 (2003) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 6    In 2003, defendant filed a section 116-3 motion for fingerprint and DNA testing. At the time, section 116-3 provided, in part:

> "(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA testing on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of trial. Reasonable notice of the motion shall be served upon the State.
>
> (b) The defendant must present a *prima facie* case that:
>
> (1) identity was the issue in the trial which resulted in his or her conviction[.]" 725 ILCS 5/116-3(a), (b)(1) (West 2002).

¶ 7    The trial court denied the motion. This court affirmed, holding that section 116-3's plain language limited it to convictions that resulted from trials, whereas defendant had pleaded guilty. *People v. LaPointe*, 355 Ill. App. 3d 1195 (2005) (table), slip order at 5 (unpublished order under Illinois Supreme Court Rule 23). We added that, in any event, the motion was fatally defective insofar as (1) fingerprint testing was not unavailable when defendant pleaded guilty (*id.*) and (2) the motion's reference to " 'hair samples' " was too vague for a court to decide whether testing this alleged evidence might produce " 'new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence' " (*id.* at 5-6 (quoting 725 ILCS 5/116-3(c)(1) (West 2002))).

¶ 8    On January 28, 2004, defendant moved for leave to file a successive petition under the Act (see 725 ILCS 5/122-1(f) (West 2004)). He alleged in part that he had amnesia when he pleaded guilty but now knew that he was actually innocent and that trial counsel was ineffective for failing to introduce evidence proving his innocence. The allegedly exculpatory evidence included that the fingerprints and hair samples taken from the crime scene did not match defendant and that a ballistics report stated that the gun recovered from his home could not be conclusively identified as the murder weapon. On April 4, 2004, defendant again asked leave to file a successive petition under the Act. He alleged that he had been unfit to plead guilty and reiterated that the fingerprints and hair samples did not match him. The trial court denied both motions. In consolidated appeals, this court affirmed. *People v. LaPointe*, 366 Ill. App. 3d 1230 (2006) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 9    In 2008, defendant moved again for leave to file a successive petition under the Act. The trial court denied the motion, and this court affirmed. *People v. LaPointe*, 403 Ill. App. 3d 1109 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23). However, per our supreme court's supervisory order (*People v. LaPointe*, 239 Ill. 2d 571 (2011) (supervisory order)), we vacated our judgment and allowed defendant to file a petition essentially limited to defendant's claim that trial counsel had been ineffective for failing to move to withdraw defendant's plea. After hearing evidence, the trial court denied the petition. This court affirmed. *People v. La Pointe*, 2015 IL App (2d) 130451.

¶ 10    On January 24, 2014, defendant again moved for leave to file a successive petition under the Act, setting out numerous claims. Pertinent here are that his trial counsel was ineffective

for failing to examine all of the forensic evidence before recommending that he plead guilty, that the State violated discovery rules by incorrectly stating that Cichelli had no criminal record, and that defendant was actually innocent. The trial court denied the motion.

¶ 11 In a summary order issued September 29, 2015, this court affirmed. *People v. La Pointe*, No. 2-14-0217 (2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Discussing the aforementioned claims, we noted as follows. Defendant contended that the State had disclosed before trial that no hair samples or fingerprints belonging to him were recovered from the crime scene. However, in affirming the denial of relief in the first section 116-3 action, we had noted that, by pleading guilty, defendant "made it impossible for a court to determine the relevance or probative value of any newly discovered evidence"; thus, *res judicata* barred relitigating claims based on counsel's failure to use favorable forensic evidence. *Id.* ¶ 14. Defendant also contended that he was actually innocent, asserting that some forensic evidence disclosed in discovery was inconsistent with his guilt. We concluded, however, that "any infirmities in the forensic evidence did not reach the actual-innocence threshold, *i.e.*, new, noncumulative, material evidence that is so conclusive that it would probably change the result on retrial." *Id.* ¶ 27; see *People v. Coleman*, 2013 IL 113307, ¶ 96.

¶ 12 On February 23, 2016, defendant filed the section 116-3 motion at issue here. We set out the pertinent portion of section 116-3, with the new language emphasized:

"(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing *** on evidence that was secured in relation to the trial *or guilty plea* which resulted in his or her conviction, and:

(1) was not subject to the testing which is now requested at the time of trial; or

(2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a *prima facie* case that:

(1) identity was the issue in the trial *or guilty plea* which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence (i) materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant, or (ii) *that would raise a reasonable probability that the defendant would have been acquitted if the results of the evidence to be tested had been available prior to the defendant's guilty plea and the petitioner had proceeded to trial instead of pleading guilty, even though the results may not completely exonerate the defendant*; and

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community." (Emphases added.) 725 ILCS 5/116-3(a)-(c) (West 2016).

¶ 13 Defendant's motion alleged as follows. Unlike in 2003, the statute now applied to convictions based on guilty pleas. Identity had been at issue in defendant's guilty plea: the State's factual basis rested almost entirely on Cichelli's statements, which provided all the evidence that defendant had been Moreno's murderer (the fact of the murder not being in doubt). According to Cichelli, defendant first visited him at about 9 a.m., left about half an hour later, and returned to the station at "[a]bout maybe 10:30 or 11:00—towards the later part of the morning" and said that he had shot someone. Cichelli called the police at about 9:45 a.m. a statement by the police dispatcher) and a cab was called to the vicinity of a nearby McDonald's between 11:15 and 11:30 a.m. (according to a statement of the cab company's dispatcher). Roger Berkshire, a municipal worker, told the police that, at about 9:30 a.m., when he was at the McDonald's, a young man with black hair asked a McDonald's employee whether he could use the phone; the employee replied that there was a pay phone nearby, and the young man walked out. Defendant had brown hair, but Cichelli had black hair. Defendant's friend Lawrence Matera told the police that, on March 7, 1978, as he, Mel Weyna, and John DuWaldt were driving on Spring Road between 10 a.m. and noon—probably close to 11 a.m.—they picked up defendant as he was walking and drove him to school. Dwayne Ronczkowski told the police that he saw defendant in school between 11 a.m. and noon and saw him again at York Road and Grand Avenue sometime between 1:30 and 2 p.m.

¶ 14 Defendant's motion requested testing of the following items of evidence: (1) latent fingerprints taken from the cab, which had been checked against defendant but not against Cichelli, even though Cichelli's prints would have been on file in 1978 because he was still on probation; (2) hair samples taken from the back of the cab, none of which had matched defendant's hair and none of which had been tested against Cichelli's hair; (3) a package of Marlboro cigarettes, with a "roach-like cigarette," found in the vicinity of the crime scene (according to defendant, he did not smoke cigarettes, although he did smoke marijuana, and it was well known in 1978 that Cichelli smoked Marlboros and marijuana); (4) the gun seized from defendant's home, which had shown " 'negative results' " for fingerprints but had not been tested for Cichelli's prints. Defendant contended that the requested testing had the scientific potential to produce new, noncumulative evidence that would be materially relevant to his claim of actual innocence. See 725 ILCS 5/116-3(c)(1)(i) (West 2016).[1] He alleged that the evidence had been in the State's custody throughout.

¶ 15 Defendant also contended that the motion was not barred by *res judicata* or collateral estoppel, as the basis for the denial of his first section 116-3 motion—that the statute did not apply to guilty pleas—no longer existed.

¶ 16 The State did not respond to defendant's motion. On April 27, 2016, the trial court denied it. The court's written order stated that the motion was barred by *res judicata*. This was not because of the earlier section 116-3 decision. Rather, the court stated, this court's order of September 29, 2015 (quoted in part earlier here), had concluded that "the expected result of the Defendant's requested testing [did] NOT have the scientific potential to produce new,

_____

[1]Because defendant pleaded guilty, however, the applicable standard was the one under section 116-3(c)(1)(ii) (725 ILCS 5/116-3(c)(1)(ii) (West 2016)).

- 5 -

noncumulative evidence." Further, we had concluded that the requested testing did not raise a reasonable probability of an acquittal if the results had been available before his plea and he had gone to trial instead. The trial court did not discuss the merits of the motion in any other respect. After the court denied his motion to reconsider, defendant timely appealed.

¶ 17    On appeal, defendant contends first that the trial court erred in holding that his 2016 section 116-3 motion was barred by *res judicata*. He reasons that the facts alleged in his motion differ from those alleged in the 2003 motion. He also notes that, in the prior proceeding, section 116-3 did not apply to convictions based on guilty pleas, as it now does. Defendant contends second that he met all the prerequisites for relief under section 116-3. He notes that, in a guilty-plea case, the results of the requested testing must have the scientific potential not to exonerate him completely, but only to raise a reasonable probability of an acquittal. See *id.* § 116-3(c)(1)(ii). He contends that, given the State's heavy reliance on Cichelli's statements, which were seriously undermined by evidence from a variety of sources, the requested testing could produce results casting important new light on the soundness of defendant's conviction.

¶ 18    The State responds that the trial court did not base its *res judicata* finding on the judgment in the prior section 116-3 case (which the State concedes would have been erroneous) but instead correctly relied on our 2015 judgment affirming the denial of leave to file a successive petition under the Act. The State argues further that defendant's 2016 motion merely speculated that Cichelli might have committed the murder and notes that, because a taxicab is typically occupied by numerous people on a given day, the presence of physical evidence that did not match defendant would prove essentially nothing. The State notes also that Cichelli was not the only person who linked the murder to defendant: defendant himself did so in statements to the police, a psychiatrist who examined him, and fellow inmates in jail. The State concludes that, regardless of *res judicata*, defendant did not satisfy the materiality test of section 116-3.

¶ 19    In reply, defendant contends that *res judicata* does not apply. He reasons that, in a proceeding under the Act, he would need to allege and prove substantive claims, such as actual innocence; but in a motion under section 116-3, he seeks only to obtain evidence to support a *future* claim of actual innocence. Moreover, he urges, the standards of proof differ: under the Act, he would need to show that newly discovered evidence is so conclusive that it would probably lead to a different result on retrial (*Coleman*, 2013 IL 113307, ¶ 96); in a section 116-3 action, he must show only that the evidence has the scientific potential to raise a reasonable probability that he would have been acquitted had he proceeded to trial (725 ILCS 5/116-3(c)(1)(ii) (West 2016)).

¶ 20    We review *de novo* the denial of a section 116-3 motion. *People v. Shum*, 207 Ill. 2d 47, 65 (2003). We are not limited to considering the grounds on which the trial court ruled; we may affirm the court's judgment on any basis called for by the record. See *People v. Olsson*, 2015 IL App (2d) 140955, ¶ 17. However, because a section 116-3 motion is essentially a pleading in the nature of a civil complaint or a petition for relief under the Act, on our *de novo* review, we must accept as true and construe liberally the well-pleaded facts in the motion unless they are contradicted by the trial court record. See *People v. Sanders*, 2016 IL 118123, ¶ 48.

¶ 21    We agree with defendant that the trial court's judgment cannot be affirmed on the basis on which it relied. The court erred in holding that our 2015 judgment denying defendant leave to

- 6 -

file a successive petition under the Act had *res judicata* effect on his 2016 motion under section 116-3.[2]

¶ 22    Under *res judicata*, a final judgment on the merits bars a similar suit involving the same parties and the same cause of action. *Kines*, 2015 IL App (2d) 140518, ¶ 21. *Res judicata* is an equitable doctrine and may be relaxed when justice requires. *Id.* Whether *res judicata* applies is a question of law, which we review *de novo*. *Id.* ¶ 20.

¶ 23    We decline to apply *res judicata* here. Although our judgment affirming the denial of defendant's motion to file a successive petition under the Act was final on the merits and involved the same parties as this proceeding, it did not involve the same cause of action. The difference is not the merely formal one in the statutory bases for the actions. See *People v. White*, 198 Ill. App. 3d 781, 784 (1989) (defendant could not use petition under Act to raise claims essentially identical to those raised in prior *habeas corpus* petition). The differences in the two proceedings go beyond mere statutory forms.

¶ 24    The trial court relied on that part of our order holding that the forensic evidence disclosed in discovery "did not reach the actual-innocence threshold, *i.e.*, new, noncumulative, material evidence that is so conclusive that it would probably change the result on retrial. See *People v. Coleman*, 2013 IL 113307, ¶ 96." *La Pointe*, No. 2-14-0217, ¶ 27. Although the court assumed otherwise, the actual-innocence threshold does not apply to the present proceeding. There are two serious differences. First, in an actual-innocence challenge, the defendant must allege and prove that *known evidence* that has been lately discovered is conclusive. But as defendant points out, in this proceeding, under section 116-3, he is seeking to obtain evidence—test data—*that does not yet exist*, and he need show only that the testing that will produce this evidence has the *potential* to reach the threshold of subsection (c)(1)(ii). Thus, proceedings under the Act and those under section 116-3 raise different issues.

---

[2]Defendant argues primarily that the judgment denying his prior section 116-3 motion did not have *res judicata* effect on the present motion, which was filed under the revised version of section 116-3. Defendant's argument is misplaced: the trial court did not rely on the prior section 116-3 judgment. The State concedes that the court could not properly have done so because the prior judgment was based on section 116-3's inapplicability to convictions based on guilty pleas, a bar that no longer exists. See *People v. Kines*, 2015 IL App (2d) 140518, ¶ 22 (*res judicata* does not apply when the judgment in the first action was plainly inconsistent with the equitable implementation of a statutory scheme, such as an intervening change in the statute).

The State also notes that defendant thus does not specifically address the trial court's actual reason for relying entirely on *res judicata* to deny defendant relief. Technically, this court could affirm the judgment on the narrow ground of forfeiture (see Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016)). However, in the interests of justice and a sound body of law, we elect to overlook any forfeiture. See *Halpin v. Schultz*, 234 Ill. 2d 381, 390 (2009).

Finally, we note that, in general, *res judicata* is an affirmative defense that may be waived or forfeited. *Schloss v. Jumper*, 2014 IL App (4th) 121086, ¶ 18. Thus, it is arguable that the trial court erred in raising it *sua sponte* after the State declined to answer defendant's motion. However, defendant does not so contend, and we shall not risk overstepping our own bounds by raising the issue *sua sponte*. Although the Act allows summary dismissals based on *res judicata* (*People v. Blair*, 215 Ill. 2d 427, 445 (2005)), that allowance appears to be predicated on the specific features of the Act's "unique" summary-dismissal procedure (*People v. O'Connell*, 227 Ill. 2d 31, 38 (2007)) and thus is not dispositive of the interesting hypothetical issue that the court's action here raises.

¶ 25 Second, even aside from the difference between the actual effect of current and known evidence and the potential effect of evidence yet to be obtained, the thresholds in the two proceedings are not interchangeable. Evidence "so *conclusive* it would probably change the result on retrial" (emphasis added) (*Coleman*, 2013 IL 113307, ¶ 96) would appear to have to be stronger than evidence "that would raise a reasonable probability that the defendant would have been acquitted" (725 ILCS 5/116-3(c)(1)(ii) (West 2016)) had it been used at trial. The strong term "conclusive" is present in the former test but not in the latter, and "probably changing the result" is arguably a higher standard than merely raising a reasonable probability of changing the result.[3]

¶ 26 As we cannot affirm the trial court's judgment on the basis of *res judicata*, we must decide whether the judgment was correct on the merits. The State argues primarily that defendant's motion failed to satisfy subsection (c)(1)(ii), because it did not establish that "the result of the testing has the scientific potential to produce new, noncumulative evidence *** that would raise a reasonable probability that [defendant] would have been acquitted" had the test results been available prior to his guilty plea and had he proceeded to trial instead of pleading guilty, even though the results might not have "completely exonerate[d]" him. *Id.* The State also argues that, even if we decide that defendant's motion satisfied the foregoing requirement, a remand is still necessary so that the trial court can determine whether the evidence to be tested has been subject to a sufficient chain of custody (see *id.* § 116-3(b)(2)).

¶ 27 To decide whether the judgment can be affirmed on the grounds urged by the State—or on any other grounds called for by the record—we must first address the meaning of section 116-3 as it applies in this case. This requires employing the standard rules of statutory construction, the fundamental one being to ascertain and effectuate the intent of the legislature. *People v. Bailey*, 386 Ill. App. 3d 68, 71 (2008). To do so, we look first to the language that the legislature used; if it is unambiguous, we must apply it straightforwardly. *Id.* at 72. We examine in turn each of section 116-3's requirements that apply in this case.

¶ 28 Subsection (a) enables a defendant to obtain testing on "evidence that was secured *in relation to the *** guilty plea* which resulted in his or her conviction." (Emphasis added.) 725 ILCS 5/116-3(a) (West 2016). The defendant can request one or more of the following types of testing: fingerprint testing, Integrated Ballistic Identification System (IBIS) testing, or forensic DNA testing. *Id.* Finally under subsection (a), the defendant must establish that the evidence to be tested either (1) "was not subject to the testing which is now requested *at the time of trial*" or (2) "although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available *at the time of trial*." (Emphases added.) *Id.* § 116-3(a)(1), (a)(2).

¶ 29 The foregoing language poses some difficulties, but none appears serious in the context of this appeal. First, it will not always be obvious what evidence has been secured "in relation to"

_____

[3] There is, of course, a syntactic inconsistency in the former test. One dictionary defines "conclusive" as "putting an end to debate or question esp. by reason of irrefutability"; lists as synonyms "decisive," "determinative," and "definitive"; and gives as an example "conclusive evidence." (Emphasis omitted.) Merriam-Webster's Collegiate Dictionary 239 (10th ed. 2001). By this definition, to speak of evidence that is *so* conclusive that it would *probably* change the result is nonsensical, stating that a certainty must exist to a degree sufficient to make it probable. Fortunately, this oddity can be ignored and the test understood by reference to what follows "conclusive."

a guilty plea. The police and the prosecution ordinarily secure most of the incriminating evidence, but the defendant is the one who pleads guilty. However, the State does not here contest that defendant satisfied this element, and it is reasonable to say that the four named items that he wants tested—the fingerprints, hair samples, cigarette package, and gun—did have a relationship to his guilty plea. The fingerprints and hair samples were recovered from the taxicab, where Moreno was killed. The cigarette package was recovered nearby.[4] The gun, of course, was mentioned in the factual basis for the plea, as defendant told the police that he had used it to kill Moreno, and he let them take it from his home and place it into evidence.

¶ 30 Theoretically, because the first three items did not actually implicate defendant, it could be argued that they were not secured "in relation to" his guilty plea. But defendant's motion asserted that these items might provide evidence that someone else was the murderer. Thus, in a sense, they were obtained in relation to the plea: defendant's theory implies that the failure to test the items might have denied him exculpatory evidence, which could have changed his decision to plead guilty. More generally, obtaining evidence that someone else committed the crime is the entire focus of section 116-3, whether as applied to convictions based on trial evidence or those based on guilty pleas. It is consistent with the intent of the statute to hold that even evidence that did not inculpate defendant can be within subsection (a). And, again, the State does not contest this element, and the trial court did not consider it. Therefore, we shall not consider it further.

¶ 31 The types of testing are limited to fingerprint, IBIS, and DNA testing. Defendant's motion requested the following: (1) fingerprint testing of the latent prints lifted from the cab, (2) DNA testing of the hairs recovered from the cab, (3) DNA testing of the cigarette package,[5] and (4) fingerprint testing of the gun. Both fingerprint and DNA testing are within subsection (a). The motion requested no other type of testing.[6]

---

[4]Exactly how near is not clear from the record. The March 8, 1978, supplementary report by the investigating officer stated that, at some time shortly after 7:20 a.m. that day, the package was found approximately two feet north of "an access drive to the Butterfield Towers apartment building, at approximately 10 ft. west of Chatham." At the preliminary hearing, the officer testified that the general area was the corner of Chatham Avenue and Harrison Street, on the south side of Elmhurst, and that the cab was parked in a "makeshift-type exit" from the apartment building.

[5]The trial court's order stated that the motion had requested "[g]eneral testing" of the cigarette package. The motion mentioned the cigarette package in two respects pertinent here. First, it stated that the package contained "Marlboro cigarettes with a roach-like cigarette" and that, although it was common knowledge in 1978 that defendant did not smoke cigarettes and that Cichelli did smoke both Marlboros and marijuana, "nothing was tested against [Cichelli]." Second, in the summary of the evidence that defendant wanted tested, the motion requested that "the evidence collected from the crime scene *** should be DNA tested" to exclude defendant and determine whether it matches any person in the "DNA database." Thus, the motion did not clearly request any testing of the cigarette package other than DNA testing.

[6]The motion did make a passing reference to "ballistic testing available now" but did not elaborate or include this type of testing among those requested. Also, the motion asked that the case be "reopened" to ensure that the tape-recorded call to the police department was made by Cichelli, and it noted that the telephone records from the gas station were never obtained to show exactly when the call was made. Insofar as the motion raised ballistic testing, tape recordings, or telephone records, it lacked merit because these matters are plainly outside the purview of section 116-3, at least as far as they relate to this case.

- 9 -

¶ 32    Finally in examining subsection (a) in relation to this case, we turn to the alternative prerequisites of subsections (a)(1) and (a)(2). The evidence must either (1) not have been "*subject* to the testing which is now requested at the time of trial" (emphasis added) (*id.* § 116-3(a)(1)) or (2) have been "*subjected* to testing previously" but be capable of being subjected to additional testing using a method that was "not scientifically available at the time of trial" and that provides a reasonable probability of producing more probative results (emphasis added) (*id.* § 116-3(a)(2)).

¶ 33    We note first a small oversight in the 2014 amendments to section 116-3. After "at the time of trial" in each subsection, there should follow "or the guilty plea." To avoid absurdity, we construe each subsection to include the missing phraseology, so as to fit the guilty-plea context. See *In re M.T.*, 221 Ill. 2d 517, 524 (2006) (court may depart from literal language of statute when needed to avoid defeating obvious intent of the legislature). The issue is therefore whether the motion's requests satisfy either prerequisite.

¶ 34    On this score, we note that subsection (a)(1) uses "subject" but subsection (a)(2) uses "subjected." "Subject" denotes what testing *could have been performed*; "subjected" denotes what testing *actually was performed*. See Webster's Third New International Dictionary 2275 (1993) (definitions of "subject" and "subjected" as adjectives); Black's Law Dictionary 1651-52 (10th ed. 2014) (definitions of "subject" as adjective and as verb).

¶ 35    As applied here, therefore, the DNA testing that the motion requested clearly satisfied subsection (a)(1), because all agree that DNA testing not only was not performed in 1978 but could not have been performed. The fingerprint testing that the motion requested requires more discussion. The fingerprints in the cab and on the gun were "subject" to testing in 1978 and, indeed, were actually "subjected" to testing. The motion contended, however, that the testing was limited to comparing the prints with defendant's standard and not with anyone else's, most pertinently Cichelli's. The motion alleged that, although Cichelli was on probation at the time, and thus his fingerprints were available, the State did not inform defendant of this fact and thus prevented any comparison of the fingerprints with Cichelli's standard.

¶ 36    It must be noted, however, that defendant's motion had to allege facts to show that the requested testing would use "a method that was not scientifically available" at the time of the plea. (Emphasis added.) 725 ILCS 5/116-3(a)(2) (West 2016). Thus, the motion could not rely on the mere allegation that certain fingerprints had not been tested against Cichelli's standard in 1978. Rather, it had to allege that a new scientific methodology for testing the prints had been made available since 1978. The motion did so, although cursorily.

¶ 37    The motion alleged that "[t]he DNA, fingerprint (AIFIS [*sic*]), and ballistic testing available now will provide a reasonable likelihood of more probative results." "AIFIS [*sic*]" is intelligible as the Automated Fingerprint Identification System (AFIS), which uses various algorithms to search a database. See *People v. Slover*, 2011 IL App (4th) 100276, ¶ 6; *People v. Manley*, 222 Ill. App. 3d 896, 901 (1991). We accept defendant's contention that the sophisticated digital database and algorithms of AFIS were unavailable to him in 1978. See, *e.g.*, *Monzo v. Edwards*, 281 F.3d 568, 573 (6th Cir. 2002) (fingerprints were taken from crime scene in 1987, but defendant was identified from them only in 1993, after AFIS had become available in that case). As defendant notes, *Manley* is the first Illinois opinion to note the use of AFIS testing, which in that case took place in 1987. See *Manley*, 222 Ill. App. 3d at 901.

¶ 38    We turn to subsection (b) of section 116-3. Subsection (b)(1) requires a defendant to present a *prima facie* case that "identity was the issue in the *** guilty plea which resulted in

- 10 -

his or her conviction." 725 ILCS 5/116(b)(1) (West 2016). Again, it is necessary to eschew a literal construction of the statute, so as to avoid absurdity. Speaking of what was "the issue" at a trial makes perfect sense; but speaking of "the issue" in a guilty plea is a contradiction in terms. A guilty plea concedes all of the issues that might have been raised at a trial. In a guilty plea, *nothing* is the "issue." Thus, we cannot rely on the literal language of subsection (b)(1).

¶ 39    Fortunately, we need not resolve this conundrum here. The trial court did not address subsection (b)(1) and the State does not do so now. Whatever subsection (b)(1) does, could, or ought to mean in the context of a guilty plea is best left to another case—or better yet to the legislature, which we invite to reconsider its choice of phraseology.

¶ 40    We turn to the next inquiry: whether defendant's motion satisfied subsection (b)(2), which requires that the evidence was subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect. *Id.* § 116-3(b)(2). Defendant's motion alleged that the trial court ordered the evidence in the case preserved and that presumably this was done. We agree with him that this allegation, although conclusional, was sufficient. As *Bailey* notes, a defendant must ordinarily rely on conclusions and presumptions to satisfy subsection (b)(2), because " 'the evidence at issue will undoubtedly have been within the safekeeping of the State, not the defendant.' " *Bailey*, 386 Ill. App. 3d at 75 (quoting *People v. Travis*, 329 Ill. App. 3d 280, 285 (2002)); see generally *People v. Johnson*, 205 Ill. 2d 381, 394 (2002).

¶ 41    The State contends that a remand would be needed to establish that there was a proper chain of custody, because, owing to its age, the evidence might be "in a condition that does not permit meaningful testing or viable results." However, this possibility does not affect whether, under the applicable case law, defendant's motion made a *prima facie* case that the evidence was subject to a proper chain of custody. Also, the State failed to contest this issue in the trial court by responding to defendant's motion, and the court never ruled on the issue either. Subsection (b)(2) provides no basis on which to affirm the judgment.

¶ 42    We turn next to the remaining contested issue in this appeal: whether defendant showed that the results of the requested fingerprint and DNA testing have "the scientific potential to produce new, noncumulative evidence *** that would raise a reasonable probability" that he would have been acquitted had the test results been available before he pleaded guilty and had he proceeded to trial. 725 ILCS 5/116-3(c)(1)(ii) (West 2016). As the parties do, we shall call this the "materiality" requirement.

¶ 43    Defendant notes that he did not need to demonstrate that the test results would "completely exonerate" him. *Id.* The problem, of course, is what defendant did have to show and whether he did so.

¶ 44    First, we agree with defendant that, because no AFIS or DNA testing was either available or performed in 1978, his motion sufficiently alleged that the requested testing has the scientific potential to produce "new, noncumulative evidence." *Id.* § 116-3(c)(1). We must therefore decide whether the motion sufficiently alleged that this evidence—the results of the fingerprint testing of the cab and the gun and the DNA testing of the hairs and the cigarette package—would raise a reasonable probability that defendant would have been acquitted had he gone to trial.

¶ 45    To do so, however, we must also consider the strength of the evidence that the State could have introduced at a trial. See *People v. Grant*, 2016 IL App (3d) 140211, ¶¶ 21-25 (on motion under section 116-3, by defendant who was convicted after trial, strength of State's evidence

was not pertinent to whether identity was at issue but was pertinent to potential of testing to produce materially relevant results); *People v. Navarro*, 2015 IL App (1st) 131550, ¶¶ 16-18 (motion did not satisfy materiality requirement for requested ballistic tests, as eyewitness testimony provided overwhelming evidence of guilt and ballistic evidence played small role). We recognize that these opinions provide limited guidance, as there the evidence of identity was introduced at trial and not merely on the factual basis for a guilty plea. Nonetheless, although we cannot know precisely what evidence would have been introduced and admitted had defendant elected to go to trial, the record does show the following.

¶ 46    Defendant confessed to the police that he murdered Moreno, and he led them to the gun that he said he had used. Defendant told Timothy Timus (whoever he was) that he had committed the crime. He also told jail inmates (perhaps including Timus) the same thing. And he told the same thing to the psychiatrist who examined him before he pleaded guilty.

¶ 47    The record contains specifics relating to defendant's admissions. At the preliminary hearing, Elmhurst police officer Robert Jones testified as follows. At 12:45 p.m. on March 8, 1978, he arrested defendant. At the police station, Jones and James O'Brien, a fellow officer, questioned him. Jones asked defendant what he had done the previous morning. Defendant responded that he had looked for work at two locations in the industrial park in Elmhurst; he was vague on the names of the employers. He said that he had been at the gas station that morning; asked whether he had used the phone there, he responded, " 'I think so.' " Asked whether he had called for a cab, defendant said no. He admitted that, at the gas station, he conversed with Cichelli and pointed to a spot on a map. Asked again whether he had called for a cab, defendant said that he remembered leaving the gas station, seeing a cab at the McDonald's about a block away, and starting to run.

¶ 48    Jones testified further as follows. Defendant said that, on the morning of March 7, 1978, when he left his home, he was carrying a gun. He described it as black with a long barrel. At the gas station, in the washroom, he showed Cichelli the gun and told him that he was going to rob and kill a cab driver. He remembered having called for the cab and explained to the officers that he did so to go from the McDonald's to York Commons. After he left the gas station, saw the cab, and entered it, he went south on York Road. The next thing that he remembered was being at York Commons and walking away from the cab. He saw a police car with its overhead lights on go by on York Road, so he reentered the cab, pushed the driver down onto the floor, and started driving south. He and the driver had been the only people in the cab at York Commons. Asked by Jones whether he remembered killing the driver, defendant said no. O'Brien then asked defendant to clarify whether, when he reentered the cab and pushed down the driver, "this was after he had killed him." Defendant nodded his head. Jones asked defendant how many gunshots he had heard from inside the cab. Defendant said two.

¶ 49    Jones testified that defendant said that he took the gun home and placed it into a closet in a spare bedroom. That evening, officers executed a search warrant. Inside the closet, they found a long black Sturm Ruger .22-caliber revolver and four boxes of .22-caliber ammunition. There was another gun, similar to the first, in the closet. The police did not ascertain whether the first gun had been used recently.

¶ 50    We note also that defendant persisted in stating or implying that he killed Moreno. In a report attached to the 2002 postconviction petition, Lyle Rossiter, a psychiatrist who examined defendant on April 13, 1978, recounted that defendant admitted to taking a gun from his father's home; showing the gun to his friend at the gas station; calling for a cab and walking to

a nearby McDonald's, where he entered the cab; riding in the cab but blacking out as a result of having ingested LSD earlier that day; recovering consciousness; seeing a police car nearby; exiting and reentering the cab and driving it away; and then exiting the cab, walking, and being picked up by friends who drove him to school.

¶ 51    In February 1997, Rossiter again examined defendant. In his report, Rossiter noted that defendant told him the following. Defendant robbed Moreno because he needed money for his drug habit. He did not want to kill Moreno but, having taken LSD that morning, he "lost control, got scared, [and] shot the cab driver." After that, he jumped into the front seat and stopped the cab. He got out, saw a police car go by, and drove the cab to a secluded area, where he went through Moreno's pockets. Rossiter asked defendant how he felt about killing Moreno. Defendant responded, " 'I wish I could take it back, bring him back, I feel so bad about it, I feel so bad that I took another man's life.' "

¶ 52    Obviously, the 1997 report would not have been available for a trial held in 1978 or shortly thereafter. But we can presume that the court would have admitted defendant's statements to the police. (Although defendant did file a motion to suppress his statements, he did not pursue it but instead pleaded guilty shortly thereafter.) There being no doubt as to the *corpus delicti* of the murder, it appears that the State would have had a strong case at a trial. Not only could it have introduced defendant's detailed confession to the police, it could have identified the weapon and linked it to him. And, of course, it could have introduced Cichelli's testimony.

¶ 53    On the other hand, pending the results of the requested testing, defendant could plausibly have contested that case. There were no independent eyewitnesses to the murder. The fingerprint evidence and the hair samples did not implicate defendant. And, based on the evidence attached to his motion, there might have been conflicting or confusing evidence on when the cab was called, from where, and, thus, by whom. Defendant correctly noted that Cichelli knew a great deal about the circumstances of the murder, was in the area at the time, and called the police shortly before it took place. Defendant did not merely assert that he did not murder Moreno. He posited an identified person as the actual murderer and relied on evidence of record to support that position. Certainly, if the requested testing connects the evidence to some unknown third person, it would not raise a reasonable probability that defendant would have been acquitted at trial. But if it connects the evidence to Cichelli, a different conclusion might well be warranted.

¶ 54    As can be seen, ascertaining the effect of test results that are unknown on a trial that was never held will not always be easy. However, defendant's motion need prove not certainties but only reasonable probabilities. Under the unique and difficult circumstances of this case, we conclude that defendant's motion made a sufficient case for the testing that he requested.

¶ 55    We are aware that defendant's theory of the case appears to be both novel and inconsistent with the theories of one or more of the postconviction actions that he filed.[7] We are also aware that the tests that defendant seeks have the scientific potential to have made an acquittal a reasonable probability *only* if they produce the specific results for which he hopes.

---

[7]It is perhaps tempting to conclude that, in those prior actions, defendant judicially admitted his guilt such that his present claim is foreclosed. However, a guilty plea is also a judicial admission. *Spircoff v. Stranski*, 301 Ill. App. 3d 10, 15 (1998). If defendant's guilty plea did not foreclose his present claim, we see no way that his subsequent admissions did either.

¶ 56    Nonetheless, we construe section 116-3 liberally to favor its purpose of making the criminal justice process more reliable by allowing, *where there is a reasonable basis*, the acquisition of sound scientific evidence that is probative on the issue of identity. Whether the evidence eventually favors the defendant or the State, its acquisition will contribute to the reliability of the criminal process and confidence in the ultimate result. Of course, each defendant pursuing relief under section 116-3 will still have the burden of overcoming several substantial hurdles. However, these hurdles should not be set so high as to endanger the important purposes of the law. Here, it is far from inconceivable that one or more of the tests could produce material results. We resolve any lingering doubts about the scope of section 116-3 on the side of more probative evidence.

¶ 57    For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County, and we remand the cause for proceedings consistent with this opinion.

¶ 58    Reversed and remanded.