NOTICE
Decision filed 12/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230119-U

NO. 5-23-0119

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Massac County. |
| | ) | |
| v. | ) | No. 98-CF-105 |
| | ) | |
| JEFFERY L. MORRISON, | ) | Honorable |
| | ) | William J. Thurston, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's denial of defendant's motion for DNA testing is affirmed where the testing would not substantially advance defendant's claim of innocence.

¶ 2    Defendant, Jeffery L. Morrison, appeals the trial court's denial of his motion for DNA testing. For the following reasons, we affirm the trial court's ruling.

¶ 3                     I. BACKGROUND

¶ 4    In October 1998, defendant was charged, by information, with one count of first degree murder, in violation of section 9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 1998)). The information alleged that defendant shot Roxane Colley with a firearm on October 23, 1998, knowing said act would cause her death. A warrant for defendant's arrest was issued. Defendant was arrested in Kentucky on October 23, 1998, on unrelated charges.

1

¶ 5 Following extradition to Illinois, the information was superseded by a bill of indictment issued on February 3, 1999. The indictment contained the original murder charge and 10 additional counts, including three ancillary first degree murder charges (counts II, III, and IV) in violation of section 9-1(a)(1) and (a)(2) of the Code (*id.* § 9-1(a)(1), (a)(2)); two counts of armed violence based on the unlawful restraint of Roxane's four-year-old children, Alex and Eugene Colley (counts V and VI) in violation of sections 10-3(a) and 33A-2 of the Code (*id.* §§ 10-3(a), 33A-2); two counts of aggravated kidnapping related to Alex and Eugene Colley (counts VII and VIII) in violation of sections 10-1(a)(1) and 10-2(a)(2) of the Code (*id.* §§ 10-1(a)(1), 10-2(a)(2)); a third count of armed violence related to defendant's possession of a 6.5-millimeter rifle while driving a stolen vehicle (count IX) in violation of section 33A-2 of the Code and section 4-103(a)(1) of the Illinois Vehicle Code (*id.* § 33A-2; 625 ILCS 5/4-103(a)(1) (West 1998)); unlawful possession of that same vehicle (count X) in violation of section 4-103(a)(1) of the Illinois Vehicle Code (625 ILCS 5/4-103(a)(1) (West 1998)); and theft of a 6.5-millimeter rifle (count XI) in violation of section 16-1(a)(1)(A) of the Code (720 ILCS 5/16-1(a)(1)(A) (West 1998)).

¶ 6 This court previously detailed the evidence adduced at defendant's trial in our order on direct appeal. *People v. Morrison*, No. 5-00-0054 (Apr. 16, 2002) (unpublished order under Illinois Supreme Court Rule 23). Therefore, we reiterate only those facts germane to the issue raised in this appeal, which are as follows. Defendant's brother, Glen Morrison, was in a romantic but contentious relationship with Roxane. On October 22, 1998, Glen, Roxane, and her two children[1] drove to R.D. Riley's residence in Kentucky to pick up a stove. The stove did not fit in Roxane's car and therefore, Riley's truck was needed to get the appliance back to Roxane's residence. By

---

[1]Conflicting testimony at trial claimed that either defendant or Roxane's mother and her boyfriend were also present on this trip.

the time the parties got the stove to Roxane's home, it was late and everyone, including Riley, spent the night at Roxane's house. That evening, Glen called Roxane a "bitch" and thereafter, a physical altercation between the two ensued with Glen eventually kicking Roxane in the head.

¶ 7    The following day, Glen, defendant, Roxane, and the children returned Riley and his truck to his residence. Riley testified that he saw defendant put something large, that was wrapped in a red towel or shirt, on the back seat floor of the car just before they left. Riley did not see the object under the red covering; however, a few days after Roxane's murder when Riley went to the closet to retrieve his rifle to hunt, the rifle was missing.

¶ 8    Around 6 p.m., on October 23, 1998, Roxane saw defendant with a rifle. She confronted defendant and accused him of stealing Riley's rifle. A brief verbal altercation occurred. Defendant then shot Roxane in the back, and she fell out the front door into the front yard. Roxane's neighbor, Andrea MacDonald, testified that she saw defendant wiping the gun off with a white rag after the shooting. Glen also testified to seeing this action. After Roxane was shot, defendant threatened to shoot Glen. Thereafter, defendant and Glen removed Roxane's body from the yard and placed it in her house. Following additional threats from defendant, Glen and defendant loaded up Roxane's twin four-year-old boys, Alex and Eugene, and left the residence in Roxane's car. Glen and a neighbor, Douglas MacDonald, who was passing Roxane's house when she was shot, both testified that they heard Eugene say that "Jeff shot mommy" and now "mommy's dead" as Eugene was being put in the car.

¶ 9    Roxane's vehicle was pulled over by law enforcement in Kentucky. Defendant was driving, Glen was in the front passenger seat, and the children were in the backseat of the vehicle. Both Alex and Eugene told Special Deputy Kevin Garland of the McCracken County Sheriff's Department that "Jeffery shot mommy." A weapon was spotted in the vehicle between defendant

3

and Glen. The weapon was taken into evidence. Glen told police that when law enforcement was following them that defendant directed Glen to "[t]hrow it out—shells, everything—unload it." Glen refused, responding that he was "not touching it." Glen testified at trial that he "[n]ever touched it."

¶ 10    Following his arrest, Glen provided a video-recorded statement to Illinois State Police Sergeant Alan Burton. Glen told the officer that defendant shot Roxane. Sergeant Burton later collected shell casings from Riley's house to compare them with the recovered rifle. Forensic testing confirmed that one of the shell casings recovered from Riley's house had, at one time, been chambered in the rifle found in Roxane's car. Riley confirmed at trial that he was the owner of the rifle found in the car. He testified that he typically did not leave the weapon loaded but would usually leave two bullets in the magazine.

¶ 11    Deputy J.D. Coleman of the McCracken County Sheriff's Department was one of the arresting officers. Deputy Coleman removed the rifle from the floorboard of the passenger side of the car. He then removed two rounds from the rifle and placed the rifle and rounds in his police car. Later, McCracken County Detective Carl Baker arrived on the scene, saw a live round on the floorboard of the passenger side of the car, placed it in evidence, and also took possession of the rifle and two live rounds removed by Deputy Coleman. The rifle (State's Exhibit No. 22), the two live rounds and the rifle's feeder spring (State's Exhibit No. 23), and the single live cartridge from the floorboard (State's Exhibit No. 24) were admitted at trial. All three exhibits were examined by an Illinois State Police forensic scientist for fingerprints. None were found.

¶ 12    On November 18, 1999, the jury found defendant guilty of first degree murder, aggravated kidnapping, unlawful possession of a stolen motor vehicle, and armed violence based on his possession of a stolen vehicle. On January 10, 2000, the trial court sentenced defendant to 40 years'

incarceration for first degree murder, to run concurrent with two 10-year sentences for the aggravated kidnapping convictions and a 12-year sentence for the armed violence conviction.[2]

¶ 13    Defendant appealed his conviction arguing, *inter alia*, that he received ineffective assistance of counsel at trial. See *Morrison*, No. 5-00-0054. This court found that defendant failed to establish prejudice because the "consistent testimonies" of Glen and other witnesses showed the evidence against defendant was "overwhelming." *Id.* order at 10. The judgment and sentence were affirmed. *Id.* order at 17.

¶ 14    On January 8, 2003, defendant filed a *pro se* postconviction petition. The trial court dismissed the petition on January 28, 2003, finding it "patently without merit." Defendant appealed and this court again rejected defendant's claims of ineffective assistance of counsel, finding that defendant failed to establish prejudice "especially in light of the overwhelming evidence of guilt in this case," citing the direct appeal decision. *People v. Morrison*, No. 5-03-0147, order at 13 (Oct. 24, 2005) (unpublished order under Illinois Supreme Court Rule 23).

¶ 15    Defendant filed a posttrial motion pursuant to section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2002)) on February 18, 2003, claiming that Glen and Douglas perjured themselves at the trial and further claimed ineffectiveness of trial and appellate counsel. The trial court denied the posttrial motion on March 13, 2003.

¶ 16    On May 5, 2011, defendant filed a motion for leave to file a successive petition for postconviction relief. The petition claimed actual innocence and was based on an affidavit prepared by Shawn Hollowell. Defendant contended that the newly discovered evidence "provide[d] credible proof totally discrediting the State's key witness, Glen Morrison" and also

---

[2]The sentence for possession of a stolen vehicle was not entered because that count was the predicate offense for the armed violence conviction.

contended that "Glen [was] the actual murderer" of Roxane. The motion further alleged that "Glen wiped off the gun and shells" prior to being arrested in Kentucky.

¶ 17 Shawn Hollowell's affidavit stated that Glen bragged to Shawn when they were both in the county jail that he was not worried about being locked up for Roxane's murder because Glen set it up to blame defendant in retaliation for defendant and Roxane having sex. The affidavit further contended that Glen told Roxane's sons that defendant shot their mother, Glen covered his lie about the murder weapon, Glen beat Roxane because she admitted to having sex with defendant and defendant was better at sex than Glen, Roxane threatened to have Glen arrested which was why he shot her, and it was not the first time Glen had gotten "away with murder."

¶ 18 On May 27, 2011, the trial court granted defendant's motion for leave to file a successive petition for postconviction relief. Thereafter, the petition was filed and counsel was appointed. The State moved to dismiss the petition on June 23, 2011, and the trial court granted that motion on January 13, 2012. Defendant appealed. On May 28, 2014, this court issued an order holding that, *inter alia*, defendant failed to make a substantial showing of actual innocence noting the affidavit contained inadmissible hearsay and affirmed the trial court's dismissal of the petition. *People v. Morrison*, 2014 IL App (5th) 120036-U.

¶ 19 On March 19, 2021, defendant moved for leave to file a second successive postconviction petition based on actual innocence and requested that his clothing be tested for gunpowder residue (GSR) or other rifle byproducts. On May 4, 2021, the trial court denied defendant's motion. Defendant appealed; however, his appellate counsel moved to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). We granted counsel's motion on August 8, 2022, and affirmed the trial court's denial of defendant's motion. *People v. Morrison*, 2022 IL App (5th) 210202-U, ¶ 28.

6

¶ 20    On July 25, 2022, defendant filed a motion for forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2022)). Therein, defendant requested that the 6.5-millimeter shell recovered in the case (State's Exhibit No. 24) be subjected to touch DNA testing. Defendant also requested that his clothes taken into evidence on October 23, 1998, be tested "for the presence of gun powder and/or other chemicals associated with the discharge of a rifle."

¶ 21    On February 9, 2023, the trial court issued an order denying defendant's motion for forensic testing. The court found, as to the DNA testing on the spent cartridge, that "nothing about the testing ha[d] the scientific potential to produce new, noncumulative evidence." It noted that the rifle and shells were originally examined for fingerprints, but none were found. It further noted that the rifle and shells belonged to Riley and the DNA testing might reveal prints that could easily belong to the owner or any other person handling the casings. The count found that "the additional testing would not raise a reasonable probability that defendant would be acquitted." The order also addressed inadequacies related to the clothes and GSR testing request and denied the motion. Defendant appeals.

¶ 22                                    II. ANALYSIS

¶ 23    Defendant's sole argument on appeal contends that the trial court erred by denying his motion for DNA testing of the live cartridge recovered from the floorboard of the vehicle. Defendant's request is governed by statute. 725 ILCS 5/116-3 (West 2024). Section 116-3 allows a defendant to

> "make a motion before the trial court that entered the judgment of conviction in his
> or her case for the performance of fingerprint, Integrated Ballistic Identification
> System, or forensic DNA testing, including comparison analysis of genetic marker

7

groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial or guilty plea which resulted in his or her conviction, and:

> (1) was not subject to the testing which is now requested at the time of trial; or

> (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." *Id.* § 116-3(a).

Reasonable notice must be provided to the State. *Id.* In order to present a *prima facie* case, the defendant must establish that "identity was the issue in the trial *** [that] resulted in his *** conviction" and "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not be substituted, tampered with, replaced, or altered in any material aspect." *Id.* § 116-3(b).

¶ 24 Once the above-stated *prima facie* requirements are met, the court must determine if the testing has the potential to produce new, noncumulative evidence "materially relevant to the defendant's assertion of actual innocence." *Id.* § 116-3(c)(1); *People v. Savory*, 197 Ill. 2d 203, 214 (2001). The Illinois Supreme Court interpreted this quoted phrase as "evidence which tends to significantly advance" a claim of innocence. *Savory*, 197 Ill. 2d at 213. To make that determination "requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test." *Id.* at 214.

¶ 25    We review the trial court's ruling on defendant's section 116-3 motion *de novo*. *People v. Stoecker*, 2014 IL 115756, ¶ 21; *People v. Brooks*, 221 Ill. 2d 381, 393 (2006). We "accept as true and construe liberally the well-pleaded facts in the petition unless contradicted by the record." *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21.

¶ 26    Here, defendant argues that that it was "highly likely that the shell was handled by the shooter." He asserts that "[s]ubjecting the shell to touch DNA testing could potentially produce a DNA profile that could be tested against known profiles." He claimed that the evidence would be new and noncumulative because there was "no physical evidence regarding who handled the rifle or shell" at trial and there was no "testimony that anyone other than [defendant] handled the rifle." He further argues that "[i]n light of the purely testimonial evidence" that was "provided by a highly motivated witness in exchange for a misdemeanor plea deal, physical evidence that someone else may have been the shooter" would significantly advance defendant's claim of innocence.

¶ 27    The parties agree that defendant met the *prima facie* requirements of section 116-3 and the only issue is whether touch DNA testing of the live shell found in the car will "significantly advance" defendant's claim of actual innocence. *Savory*, 197 Ill. 2d at 213. While section 116-3 should be construed liberally (see *People v. LaPointe*, 2018 IL App (2d) 160432, ¶ 56), no matter how liberally we view the statute and defendant's pleading, advancement of defendant's claim of innocence cannot be shown by granting his motion to have the live cartridge tested for DNA.

¶ 28    First, it was undisputed that the rifle and ammunition were owned by Riley. Riley testified that he usually kept two shells in the magazine, which is the exact number found in the magazine. If the rifle and the cartridge were both obtained from Riley's residence, it is more likely than not that Riley's DNA would be found on the cartridge. Such conclusion does nothing to assist defendant with his claim of actual innocence.

¶ 29    We agree with defendant's claim that there was no physical evidence that was submitted regarding who handled the rifle or the shells on or before October 23, 1998. However, the lack of evidence was due to the fact no fingerprints were found when the rifle, the shells/magazine, or the floorboard cartridge were sent for fingerprint testing. We note that both Glen and Andrea testified at trial that they both saw defendant wipe the rifle down with a white rag. We further note that even if we ignore Glen and Andrea's testimonies that dealt solely with the rifle, we cannot ignore defendant's allegation in his verified May 5, 2011, successive postconviction petition that stated, "Glen wiped off the gun and shells" prior to their arrest in Kentucky. Admittedly, it is difficult to reconcile defendant's previous allegation with his current request. This is especially true given the lack of fingerprints found in the initial testing and no scientific data showing that touch DNA would remain on the cartridge after it was previously wiped off.

¶ 30    Defendant's motion is further undermined by his claim that finding Glen's DNA on the live cartridge would advance his claim of innocence. Little merit can be found in the argument because it is based on Glen's alleged perjury. Our review of the record confirms that Glen's testimony was limited to the rifle and the shells found therein and that Glen provided no testimony as to whether he did or did not touch the cartridge found on the floorboard. As such, even if Glen's DNA was found, no claim of perjury is sustainable. Further subverting defendant's motion was testimony from Dana Warner, one of the State's forensic experts, who clarified that a person's DNA was expected to be found on their shoes. It was undisputed that Glen, and his shoes, were on the same floorboard where the cartridge was found on the night of the arrest as well as at least two other occasions prior to the murder. Accordingly, even if Glen's DNA was found on the cartridge, it would do nothing to advance defendant's claim of innocence.

¶ 31    We further note that while evidence at trial confirmed that Riley's rifle was the murder weapon, there was no evidence submitted at trial regarding (1) how the cartridge ended up on the front passenger side floorboard, (2) the duration the cartridge may have been in the vehicle, (3) how the cartridge was connected to the murder, or (4) whether the murderer touched the cartridge. Further, there was no evidence that the cartridge was ever loaded into the murder weapon as it did not contain the tool marks of a chambered cartridge in that rifle. Given the lack of information regarding the cartridge, it is possible that the cartridge could contain transfer DNA from the shoes of anyone and everyone who rode in the front passenger seat of Roxane's car.

¶ 32    Moreover, the evidence at trial against defendant was overwhelming. While there were some minor contradictory statements, none were of such magnitude that we could classify the evidence as closely balanced requiring forensic review of every piece of evidence to ensure confidence in the verdict. The live cartridge found on the floorboard was trivial and insignificant, especially when compared to the excited utterance from Roxane's four-year-old child, Eugene, proclaiming that defendant shot his mother. Therefore, we cannot find that the cartridge, or any touch DNA that may be attached thereto, would advance defendant's claim of innocence. See *Savory*, 197 Ill. 2d at 214-15.

¶ 33                        III. CONCLUSION

¶ 34    For the above-stated reasons, we affirm the trial court's denial of defendant's motion for DNA testing.

¶ 35    Affirmed.

11